QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Diane M. Doolittle (Bar No. 142046)
  dianedoolittle@quinnemanuel.com
  Margret M. Caruso (Bar No. 243473)
  margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000

*Attorneys for Plaintiffs Cruise LLC and*
*GM Cruise Holdings LLC*

KIRKLAND & ELLIS LLP
  Dale Cendali (SBN 1969070)
  dale.cendali@kirkland.com
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800

  Diana Torres (Bar No. 162284)
  diana.torres@kirkland.com
2049 Century Park East, Suite 3700
Los Angeles, California 90067

*Attorneys for Plaintiff General Motors LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRUISE LLC, a Delaware limited liability company, GM CRUISE HOLDINGS LLC, a Delaware limited liability company, and GENERAL MOTORS LLC, a Delaware limited liability company,<br><br>                    Plaintiff,<br><br>            vs.<br><br>FORD MOTOR COMPANY, a Delaware corporation,<br><br>                    Defendant. | CASE NO. 3:21-cv-05685-SI<br><br>**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge:       Honorable Susan Illston<br>Date:        September 10, 2021<br>Time:        10:00 am<br><br>Trial Date:  None Set |

1

## NOTICE OF MOTION AND MOTION

2        PLEASE TAKE NOTICE that on September 10, 2021, at 10:00 a.m., or as soon as the matter

3   may be heard, in the courtroom of the Honorable Susan Illston at the United States District Court

4   for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102,

5   Plaintiffs Cruise LLC, GM Cruise Holdings LLC, and General Motors LLC shall move and hereby

6   do move the Court for a preliminary injunction against Defendant Ford Motor Company, pursuant

7   to Federal Rule of Civil Procedure 65 and Civil Local Rule 7-2.

8        As set forth in detail in the Proposed Order submitted with this motion, Plaintiffs seek an

9   order enjoining Defendant, its owners, officers, directors, employees, agents, servants,

10  representatives, affiliates, related companies, and all other persons, firms, or corporations acting in

11  active concert or participation with it, from any and all development, production, promotion, sale,

12  and/or distribution of any products or services that use the mark CRUISE or any confusingly similar

13  variant, including but not limited to "BlueCruise," in connection with its automated driving

14  technology.

15       This Application is made on the grounds that: (1) Plaintiffs will be irreparably harmed if

16  Defendant is not enjoined from infringing the CRUISE mark; (2) Plaintiffs are likely to succeed on

17  the merits of the claims they have asserted in their Complaint; (3) the balance of hardships tips

18  strongly in favor of Plaintiffs; and (4) the public interest overwhelmingly supports the issuance of a

19  preliminary injunction.

20       Plaintiffs' motion is based on this notice of motion and motion; the following memorandum

21  of points and authorities; the declarations of Kristine Boyden, Dr. Louise Zhang, Dr. Yoram (Jerry)

22  Wind, Timothy Gorbatoff, Mario Maiorana, Jason Sledziewski, and Diane Doolittle; all matters of

23  which the Court may take judicial notice; all other pleadings on file in this action; and any other

24  written or oral argument that Plaintiffs may present to the Court.

25

26

27

28

| DATED:  July 30, 2021 | QUINN EMANUEL URQUHART & SULLIVAN, LLP | |
|---|---|---|
| | By | */s/ Diane M. Doolittle* |
| | Diane M. Doolittle<br>*Attorneys for Plaintiffs Cruise LLC<br>and GM Cruise Holdings LLC* | |

| DATED:  July 30, 2021 | KIRKLAND & ELLIS, LLP | |
|---|---|---|
| | By | */s/ Diana M. Torres* |
| | Diana M. Torres<br>*Attorneys for Plaintiff General Motors LLC* | |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION......................................................................................................1

STATEMENT OF FACTS........................................................................................3

LEGAL STANDARD ...............................................................................................7

ARGUMENT ............................................................................................................8

I.      A PRELIMINARY INJUNCTION IS WARRANTED AND NECESSARY ....................8

      A.      GM and Cruise are Likely to Succeed on the Merits. .................................8

           1.      The CRUISE Marks are Valid and Protectable..............................9

           2.      Ford's Use of "BlueCruise" is Likely to Cause Confusion............................10

                a.      "BlueCruise" Will Cause Forward Confusion. ................................10

                b.      "BlueCruise" Will Cause Reverse Confusion. ................................11

                c.      The Sleekcraft Factors Confirm "BlueCruise" Will Cause A Likelihood of Confusion with both GM and Cruise. ..................12

                      i.      The Strength of the Mark Factor Favors GM and Cruise, For Both Forward and Reverse Confusion. .............12

                      ii.      The Relatedness of the Goods Factor Favors GM and Cruise. ........................................................15

                      iii.      The Similarity of the Marks Factor Favors GM and Cruise. ........................................................16

                      iv.      The Evidence of Actual Confusion Factor is Neutral. .........17

                      v.      The Marketing Channels Factor Favors GM and Cruise. ........................................................17

                      vi.      The Degree of Consumer Care Factor Favors GM and Cruise. ........................................................19

                      vii.      Ford's Intent Favors GM and Cruise...................................20

                      viii.      The Likelihood of Expansion Factor is Irrelevant. .............21

      B.      Plaintiffs Will Suffer Irreparable Harm Without an Injunction. ...............21

           1.      Irreparable Harm is Presumed...................................................22

           2.      Ford's Use of "BlueCruise" Irreparably Harms Plaintiffs' Ability to Control Their Reputations and Goodwill...................................22

C.     The Public Interest Strongly Favors an Injunction..................................................24

D.     The Balance of Equities Strongly Favors an Injunction. .........................................25

CONCLUSION .................................................................................................................................25

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

## Cases

*AECOM Energy and Construction, Inv. v. Morrison Knudsen Corp.*,
748 Fed. Appx. 115 (9th Cir. 2018) ................................................................. 21

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................... 8

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) ............................................................... passim

*Bose Corp. v. QSC Audio Products, Inc.*,
293 F.3d 1367 (Fed. Cir. 2002) ................................................................. 16

*Bracco v. Lackner*,
462 F. Supp. 436 (N.D. Cal. 1978) ............................................................ 7

*Brookfield Communications, Inc. v. West Coast Entm't Corp.*,
174 F.3d 1036 (9th Cir. 1999) ............................................................. 8, 17

*Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*,
78 F.3d 1111 (6th Cir. 1996) ..................................................................... 19

*Charles Schwab & Co., Inc. v. Hiberia Bank*,
665 F.Supp. 800 (N.D. Cal. 1987) ............................................................ 19

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
843 F.2d 600 (1st Cir. 1988) ...................................................................... 25

*Cyto Sport, Inc. v. Vital Pharm., Inc,*
617 F.Supp.2d 1051 (E.D. Cal. May 6, 2009).......................................... 16

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997)............................................................... 9, 17

*Dreamwerks Production Group, Inc., v. SKG Studio*,
142 F.3d 1127 (9th Cir. 1998)............................................................. 11, 13

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
967 F.2d 1280 (9th Cir. 1992) ................................................................. 15

*Eclipse Assocs. Ltd. v. Data Gen. Corp.*,
894 F.2d 1114 (9th Cir. 1990) ................................................................. 13

*Flynt Distrib. Co. v. Harvey*,
734 F.2d 1389 (9th Cir. 1984).................................................................. 8

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
618 F.3d 1025 (9th Cir. 2010)........................................................... 12, 15

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000)................................................................. 12

*Henry Schein, Inc. v. Cook*,
191 F. Supp. 3d 1072 (N.D. Cal. 2016) ................................................ 8, 24

*In re Shell Oil Co.*,
992 F.2d 1204 (Fed. Cir. 1993) ............................................................... 24

*Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*,
559 F.3d 985 (9th Cir. 2009)................................................................... 24

*Ironhawk Technologies, Inc. v. Dropbox, Inc.*,
994 F.3d 1107 (9th Cir. 2021) ................................................................................... 13, 17

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
828 F.3d 1098 (9th Cir. 2016) .......................................................................................... 10

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ............................................................................................ 8

*Karl Storz Imaging, Inc. v. Pointe Conception Medical, Inc.*,
2011 WL 13195980 (C.D. Cal. Aug. 1, 2011) ................................................................. 21

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
762 F.3d 867 (9th Cir. 2014) ..................................................................................... 14, 16

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
796 F.2d 254 (9th Cir. 1986) ........................................................................................... 17

*M.R. v. Dreyfus*,
697 F.3d 706 (9th Cir. 2012) ........................................................................................... 21

*Masters Software, Inc. v. Discovery Communications, Inc.*,
725 F.Supp.2d 1294 (W.D. Wa., Jul. 16, 2010) ................................................... 14, 15, 18

*Matal v. Tam*,
137 S. Ct. 1744 (2017) ................................................................................................ 9, 20

*Michigan v. United States Army Corp. of Engineers*,
667 F.3d 765 (7th Cir. 2011) ........................................................................................... 21

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
856 F.2d 1445 (9th Cir. 1988) ......................................................................................... 13

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) ............................................................................. 10, 12, 13

*Niantic, Inc. v. Global++*,
2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) .......................................................... 23, 24

*Optinrealbig.com, LLC v. Ironport Systems, Inc.*,
323 F.Supp.2d 1037 (N.D. Cal. 2004) ............................................................................ 21

*Palantir Techs. Inc. v. Palantir.net, Inc.*,
2008 U.S. Dist. LEXIS 6448 (N.D. Cal. 2008) ............................................................... 15

*Pimentel v. Dreyfus*,
670 F.3d 1096 (9th Cir. 2012) ............................................................................................ 8

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*,
354 F.3d 1020 (9th Cir. 2004) ......................................................................................... 21

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ......................................................................................... 17

*Premier Electronics Laboratory, Inc v. Aston*,
914 F.2d 1496 (9th Cir. 1990) ......................................................................................... 17

*Rearden LLC v. Rearden Commerce, Inc.*,
683 F.3d 1190 (9th Cir. 2012) ......................................................................................... 23

*Regents of University of California v. American Broadcasting Companies, Inc.*,
747 F.2d 511 (9th Cir. 1984) ........................................................................................... 22

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ........................................................................................... 22

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009).............................................................................. 8

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001).............................................................................. 7

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
  2013 WL 4528539 (N.D. Cal. 2013).................................................................. 21

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (2d Cir. 1999).................................................................................. 23

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992).............................................................................................. 9

*United Healthcare Ins. Co. v. Advance-PCS*,
  316 F.3d 737 (8th Cir. 2002).............................................................................. 21

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981).............................................................................................. 7

*Vertos Medical, Inc. v. Globus Medical, Inc.*,
  2009 WL 3740709 (N.D. Cal., 2009)................................................................ 17

*Walter v. Mattel, Inc.*,
  210 F.3d 1108 (9th Cir. 2000)............................................................................ 13

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
  824 F. Supp. 2d 1003-14 (C.D. Cal. 2011)........................................................ 22

*Winter v. Nat. Res. Def Council, Inc.*,
  555 U.S. 7 (2008).................................................................................................. 8

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010)...................................................................... 12, 13

## Statutes

15 U.S.C. § 1057(b) ................................................................................................ 9

15 U.S.C. § 1072 .................................................................................................... 9

15 U.S.C. § 1114(1)(a) ........................................................................................... 8

15 U.S.C. § 1116(a) .......................................................................................... 8, 21

15 U.S.C. § 1125(a) ............................................................................................... 8

Cal. Bus. & Prof. Code § 14272............................................................................ 8

## Rules

Fed. R. Civ. P. 65 .................................................................................................... 7

## Other Authorities

Trademark Manual of Examining Procedure ("TMEP") § 1209.01(a).......................... 12

TMEP § 1209.01(b)................................................................................................ 13

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## INTRODUCTION

3        Plaintiff General Motors LLC ("GM") and its sister company, Cruise LLC, have each

4  devoted nearly a decade to creating a suite of consistently branded, high quality products in the

5  rapidly emerging automated driving space.  Both have diligently protected their respective marks,

6  including their registered SUPER CRUISE and CRUISE marks.  Fully aware of GM and Cruise's

7  rights, Defendant Ford Motor Company ("Ford") announced it would rename its planned advanced

8  driver assistance feature enhancement "BlueCruise."  Plaintiffs seek a preliminary injunction to

9  prevent Ford from using that name to irreparably injure GM and Cruise by causing confusion with

10 their marks, diminishing the power and value of those marks, and interfering with their good will.

11       GM named its advanced driver assistance technology "Super Cruise" back in its early

12 development in 2012.  GM filed its trademark application for SUPER CRUISE in 2016, and that

13 now-registered mark has been featured in its Cadillac CT6 cars since 2017.  Super Cruise has been

14 a resounding technology success, with 85% of users saying its availability would weigh heavily on

15 their future car purchasing decisions.  Plaintiff Cruise LLC (along with its parent, GM Cruise

16 Holdings LLC, collectively, "Cruise") joined the GM family in 2016 as a subsidiary of General

17 Motors Company.  Cruise  is devoted to developing fully autonomous vehicle technology and

18 building a brand that the public associates with safe, smart, and zero emission self-driving cars.  Its

19 registered CRUISE mark, for which it filed an application in 2016, serves as the core of that

20 brand.  Cruise joined the GM family, becoming a subsidiary of General Motors Company ("General

21 Motors") in 2016.

22       For the past five years, GM and Cruise have together created a family of CRUISE trademarks

23 across the spectrum of automated driving technologies, including SUPER CRUISE, ULTRA

24 CRUISE, HYPER CRUISE, DYNA CRUISE, CRUISE, CRUISE AV, and CRUISE ORIGIN.

25 SUPER CRUISE is regarded as one of the most advanced autonomous driver-assist features found

26 on a production vehicle, while CRUISE is the first company in the world approved for driverless

27 vehicle operations for passenger transport in California.

28

For several years, Ford has offered "Co-Pilot360" as its automated driver assistance program across its fleet.  In 2020, it announced that it would soon launch an enhancement to that technology to compete with Super Cruise under the name "Active Drive Assist."  In April 2021, however, with full knowledge of the GM and Cruise family of CRUISE-formative marks (the "CRUISE marks"), Ford announced its plan instead to discard the name "Active Drive Assist" and instead use "BlueCruise."  BlueCruise would compete head to head with Super Cruise and indirectly, as a less advanced technology, with Cruise—but appear to the world as though it were related.

Ford's action will cause classic, forward confusion for GM, using the core of GM's automated driving technology brand to compete head-to-head.  Ford's infringement is also likely to cause "reverse confusion," which occurs, for example, when an emerging player like Cruise is first to stake a claim to a trademark, only to have a much larger, established player like Ford come in and use a confusingly similar mark, swamping the public's association of the senior user's mark.  Indeed, Ford's plans to market BlueCruise threaten to swamp both companies' rights, as GM has limited its rollout of Super Cruise technology in anticipation of a coordinated expansion of GM and Cruise's CRUISE-formative marks in the coming years.  This likely confusion not only gives rise to a presumption of irreparable harm, but will in fact cause irreparable harm, because it will compromise both GM's and Cruise's ability to control the association of their hard-earned reputations for safety, and both Plaintiffs' ability to build and introduce their technology with a distinctive brand, which trademark law is designed to protect.

GM and Cruise are likely to succeed on their claims because Ford's threatened and unnecessary use of the CRUISE mark is likely to cause confusion for consumers and cause irreparable harm to GM and Cruise.  The public interest and balance of equities and hardships also favor granting preliminary relief.  Ford has not yet released its BlueCruise enhancement to the public.  In fact, it has demonstrated that it is fully capable of proceeding without an infringing name, because it not only previously had a different name for this technology but *it actually uses a different, non-infringing name—"ActiveGlide"—for the same system* in its Lincoln line of cars.

This motion seeks to stop Ford from irreparably harming GM and Cruise by drafting off their CRUISE-formative marks and associating them with Ford technology that is less evolved and

1  less tested, thereby interfering with GM and Cruise's right under trademark law to build the

2  distinctiveness of their brands and their reputation for quality.  By its own conduct, Ford has

3  demonstrated that it would not be unduly burdened by this Court's granting of preliminary relief to

4  Plaintiffs, because Ford is fully able to use either of two alternate, non-infringing names it has

5  announced to the market for its unreleased technology (not to mention any other non-infringing

6  name) and has no excuse for not doing so in the first place.  As set forth more fully below, GM and

7  Cruise respectfully ask this Court to grant them a preliminary injunction.

8  **STATEMENT OF FACTS**

9  **The Technology.**  Automated driving encompasses a range of highly sophisticated

10  technologies that allow cars to perform various operations without the intervention of a human

11  being, up to level 5 autonomy in which no human intervention is required for any vehicle functions.

12  (Declaration of Dr. Louise Zhang, ¶ 5.)  While automobiles have long had some features that shift

13  control of some operations from the driver to the automobile (automatic transmission, cruise control,

14  etc.), automated driving technologies represent a sea-change in which the vehicles respond and react

15  to the environments in which they operate.  Features such as automatic transmission and cruise

16  control do not even rise to level 0 of the six levels of driving automation categorized by the Society

17  of Automotive Engineers ("SAE").  (*Id.*)  The new wave of semi-autonomous and fully autonomous

18  vehicles ("AVs") use sensors and software to perform aspects of the task of driving, such as steering,

19  changing lanes, accelerating, reacting to the speed of a leading car, and, in some cases, performing

20  the entire driving task in a defined environment.  (Declaration of Mario Maiorana, ¶ 3.)  The

21  technology is still in development, and different levels and approaches are plainly apparent today.

22  (Zhang Decl., ¶ 5.)  Some companies are combining features such as lane-keeping and lane-

23  changing into advanced driver assistance suites that over time will move toward fully autonomous

24  driving.  (*Id.*)  Other companies are developing technologies that will not launch commercially until

25  they are capable of fully autonomous driving in a defined environment.  (*Id.*, ¶ 9.)

26  **GM's SUPER CRUISE.**  GM's SUPER CRUISE system is a semi-autonomous driving

27  feature that allows for hands-free driving on more than 200,000 miles of compatible divided

28  highways.  (Declaration of Jason Sledziewski, ¶ 2.)  GM began developing the technology more

than a decade ago and has invested substantial sums developing and marketing it as a highly reliable, state of the art system.  (Maiorana Decl., ¶ 3.)  Using real-time cameras, sensors, and GPS, along with LiDAR precision map data, GM's proprietary system keeps the vehicle centered in the driving lane and at a safe distance from surrounding vehicles.  (Sledziewski Decl., Ex. 7.)  As described in numerous articles and as shown in many videos publicly available online, the technology automatically slows the vehicle down on mapped roads as needed and then resumes the set speed when appropriate.  (*See, e.g.*, *id.*, ¶¶ 4-5.)  SUPER CRUISE technology does all this without the need for the driver's hands on the wheel or feet on the pedals.  (*Id.*, Ex. 9; Maiorana Decl., ¶ 3.)

Since even before its commercial launch, GM's semi-autonomous "Super Cruise" automated driving technology has been very highly regarded.  GM announced that technology using the Super Cruise name in 2012, and first made its Super Cruise technology commercially available in the Cadillac CT6 in 2017.  (Maiorana Decl., ¶ 3.)  In October 2013, *Popular Mechanics* placed GM on its list of 10 Innovators Who Changed the World in 2013 because of its SUPER CRUISE technology, bestowing on GM's engineering team a "Breakthrough Award."  (Sledziewski Decl., ¶ 7.)  It has been called "one of the most advanced autonomous driver-assist features found on a production vehicle," by *Motor Authority* and has been rated number one by Consumer Reports in both 2018 and 2020, the only two years in which that institution reviewed automated driving technology.  (*Id.*, ¶¶ 8-9, Exs. 6, 7, 10.)  Historically available only in its Cadillac line, GM has begun expanding the availability of its Super Cruise technology to 22 other GM models.  (Maiorana Decl., ¶ 3.)  The Sledziewski and Maiorana declarations filed with this motion and their exhibits provide greater detail about the achievements and recognition of the Super Cruise technology.

**Cruise.**  In 2013, entrepreneur Kyle Vogt founded Cruise to fulfill his dream of making cars that could drive themselves.  (Declaration of Kristine Boyden, ¶ 6.)  Ever since, Mr. Vogt has been a pioneer in the autonomous vehicle industry.  (*Id.*)  By December 2015, Cruise was testing advanced automated driving systems in complex environments.  (*Id.*)  In May 2016, General Motors acquired Cruise, making Cruise the first company with the ability to manufacture and produce fully integrated autonomous vehicles on a global scale.  (*Id.*)  In June 2018, after receiving additional outside investments, GM Cruise Holdings LLC (which wholly owns Cruise LLC) transitioned from

1   being a wholly-owned subsidiary to being a majority-owned subsidiary of General Motors.  (*Id.*)

2      Cruise currently operates a fleet of autonomous vehicles in San Francisco—one of the most

3   complex and unpredictable driving environments in the United States. (Zhang Decl., ¶ 9.)  Cruise's

4   autonomous vehicles daily encounter unexpected construction, weaving cyclists, jay-walking

5   pedestrians, and six-way intersections.  (*Id.*)  Cruise's autonomous vehicles continue to undergo

6   safety testing and validation:  in 2020 alone, Cruise vehicles autonomously drove almost 1,000,000

7   test miles.  (*Id.*)

8      Automated driving technology is relatively new, and players in the industry are working to

9   earn the trust of the public.  (Declaration of Dr. Yoram (Jerry) Wind, ¶¶ 17-20, 92, 95-100.)

10   Recognizing how crucial it is to have a positive association in the public consciousness between

11   Cruise and its products, Cruise has expended significant resources developing the Cruise brand and

12   associating it with best-in-class automated driving technology and safety.  (Zhang Decl., ¶ 7.)  The

13   CRUISE mark is displayed prominently on the fleet of 140 autonomous vehicles that navigate the

14   streets of Phoenix and San Francisco every day, and Cruise has spent millions of dollars to develop

15   goodwill among the public through a commitment to creating technology that is safe, reliable, and

16   community-minded.  (*Id.*; Boyden Decl., ¶ 9, Ex. A.)

17      Although it is a startup, Cruise's investments are beginning to pay off:  *Forbes* recently

18   called Cruise one of "the leading developers of autonomous ride services," and *The Verge*

19   highlighted Cruise's commitment not just to safety and excellence, but to the environment, noting

20   that Cruise is "one of the few autonomous vehicle companies to use only electric cars in its fleet

21   [and] is going a step further by committing to using only '100 percent renewable energy' to power

22   its EVs." (Boyden Decl., Ex. 12.)  Cruise employs over 1,800 individuals to help achieve its goals

23   and to make Cruise a distinctive and well-respected name in the industry.  (*Id.*, ¶ 10.)

24      Cruise has focused not only on developing automated driving goods and services, but also

25   on using its technology for charity and community service initiatives that Cruise has spearheaded.

26   For example, throughout the COVID-19 pandemic and related shelter-in-place orders, Cruise

27   devoted vehicles from its fleet to deliver food for several Bay Area food banks, delivering over

28   1,000,000 meals to San Francisco residents in need.  (Boyden Decl., ¶ 9.)  Building on this work,

1   Cruise recently launched the "Cruise for Good" campaign with an ongoing commitment to devote

2   at least 1% of its vehicle fleet to serving communities wherever Cruise is operating, partnering with

3   local nonprofit and community organizations to help those most in need.  (*Id.*)

4        **GM and Cruise's CRUISE Family of Marks.**  GM has worked to develop and expand the

5   family of CRUISE marks in the automated driving field.  In June 2016, GM filed a trademark

6   application for SUPER CRUISE in International Class 9 for use in connection with "Computer

7   software, cameras, ultrasonic sensors, global positioning system and radar object detectors for the

8   semi-autonomous driving of motor vehicles."  (Declaration of Timothy Gorbatoff, ¶ 2.)  That

9   application matured into Reg. No. 5,387,518 in January 2018.  (*Id.*)  Since then, GM has filed an

10   additional trademark application for use of SUPER CRUISE in related goods and services as well

11   as for ULTRA CRUISE, DYNACRUISE, and HYPER CRUISE, all in connection with automated

12   driving technology and related services.  (*Id.*, ¶¶ 3-6.)

13        Cruise owns Federal Trademark Registration No. 6,008,158 for CRUISE in International

14   Class 9 for use in connection with "Computer software for the autonomous driving of motor

15   vehicles," which was applied for around the same time that GM filed its application for SUPER

16   CRUISE in 2016, and was registered on the principal register on March 10, 2020.  (Boyden Decl.,

17   ¶ 15, Ex. F.)  Cruise also owns Reg. No. 6,412,962 for CRUISE FOR GOOD, as well as Federal

18   Trademark Applications for CRUISE in connection with additional goods and services, CRUISE

19   AV, CRUISE FUTUREWORKS, and CRUISE ORIGIN.  (*Id.*, Ex. G.)  The U.S. Patent and

20   Trademark Office has issued notices of allowance for all of these applications.  (*Id.*)

21        **Ford's Intent to Use the CRUISE Mark Without Permission.**  Despite this background,

22   and having full knowledge of the CRUISE family of marks, on April 14, 2021, Ford announced that

23   later this year it "will begin offering its new BlueCruise hands-free highway driving system to

24   customers . . . ."  (Wind Decl., Ex. B.)  The "BlueCruise" system will reportedly be made available

25   through "over-the-air software updates [for] 2021 F-150 and 2021 Mustang Mach-E models

26   equipped with the available Ford Co-Pilot360™ Active 2.0 Prep Package."  (*Id.*)  Ford says that

27   "[t]he feature allows a driver to operate truly hands-free on prequalified sections of divided

28   highways called Hands-Free Blue Zones" that are in the "Ford GPS mapping system."  (*Id.*)  Ford

1   states that BlueCruise software is an "evolution of Ford Co-Pilot360 Technology" and that it is

2   "targeting to sell more than 100,000 vehicles equipped with BlueCruise in the first year . . . ." (*Id.*)

3   Ford does not have the permission or consent of GM or Cruise to use "BlueCruise." (Boyden

4   Decl., ¶ 18; Gorbatoff Decl., ¶ 7.)  Ford also has no U.S. trademark registration or application for

5   "BlueCruise."  (Declaration of Diane Doolittle, ¶ 6.)  The BlueCruise software has not yet been

6   deployed to eligible Ford customers, and a host of other names are available to Ford to implement

7   well in advance of the actual release of its product, which in Ford's words, is an "evolution" of the

8   technology Ford currently brands as "Co-Pilot360 Technology."  (Wind Decl., Ex. B.)  Indeed, the

9   name Ford originally announced for this enhancement was "Active Drive Assist," and Ford is

10  planning to deploy the same new technology in its Lincoln brand as "ActiveGlide."  (Doolittle Decl.,

11  ¶¶ 3-4 Exs. B, C.)  Yet, Ford now insists on calling this same technology "BlueCruise" as well.

12  GM and Cruise sought to resolve this issue without litigation.  GM reached out to Ford days

13  after the "BlueCruise" announcement, and in a letter from counsel, Cruise reminded Ford of its

14  substantial investment in the CRUISE mark and brand and the centrality of that brand to Cruise's

15  identity.  (*Id.*, ¶ 2 Ex. A.)  This was to no avail.  Despite being in a position to change the name of

16  its as-yet unreleased software before it had even begun to market it on a broad scale (including by

17  keeping or modifying the existing name of its automated driving technology), Ford instead insisted

18  that it would move forward with the "BlueCruise" name, despite the articulated harm this would

19  cause GM and Cruise.  (*Id.*, ¶ 5.)  After months of negotiation, lengthy settlement discussions, and

20  litigation stand-still agreements extended multiple times, in which Ford agreed that the delay would

21  not be held against Plaintiffs, GM and Cruise seek the Court's help to protect their trademark rights,

22  before Ford begins selling its announced BlueCruise technology, and before Ford causes significant

23  irreparable harm.  (*See id.*)

24  ## LEGAL STANDARD

25  The purpose of a preliminary injunction is "to preserve the status quo without adjudicating

26  the merits," and, as such, a court may grant such relief where doing so would "preserve the relative

27  positions of the parties until a trial on the merits can be held."  *Bracco v. Lackner*, 462 F. Supp. 436,

28  442 n.3 (N.D. Cal. 1978); *see also University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981);

1  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001);

2  Fed. R. Civ. P. 65.  When deciding whether a preliminary injunction is appropriate, courts apply a

3  four-factor balancing test that considers whether the movant has shown "[1] that [it] is likely to

4  succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary

5  relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public

6  interest."  *Winter v. Nat. Res. Def Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Stormans, Inc. v.*

7  *Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072,

8  1076 (N.D. Cal. 2016).  Where a likelihood of success on a trademark infringement claim is shown,

9  irreparable harm is presumed.  15 U.S.C. § 1116(a).

10     Under the Ninth Circuit's "serious questions" standard, a preliminary injunction should issue

11  where the plaintiff shows there are "serious questions going to the merits" and that the "balance of

12  hardships tips sharply in the plaintiff's favor," where the other two prongs are also satisfied.

13  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  A court may rely

14  on many forms of evidence in its analysis.  *E.g., Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th

15  Cir. 2009); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

16                                    **ARGUMENT**

17  **I.**     **A PRELIMINARY INJUNCTION IS WARRANTED AND NECESSARY**

18     GM and Cruise satisfy each of the four elements evaluated for injunctive relief.

19          **A.**     **GM and Cruise are Likely to Succeed on the Merits.**

20     A plaintiff satisfies the first factor by "demonstrat[ing] a fair chance of success on the merits,

21  or questions serious enough to require litigation."  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105–06

22  (9th Cir. 2012) (internal quotation marks omitted).   To prevail on a claim for trademark

23  infringement, the plaintiff must show that (1) its mark is valid and protectable, and (2) use of the

24  mark by the defendant is likely to cause confusion.  *Brookfield Communications, Inc. v. West Coast*

25  *Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999); 15 U.S.C. § 1114(1)(a) (registered marks); 15

26  U.S.C. § 1125(a) (unregistered marks); Cal. Bus. & Prof. Code § 14272 (following federal law).

27  Some factors "are much more important than others, and the relative importance of each individual

28  factor will be case-specific."  *Brookfield*, 174 F.3d at 1054.  For example, where the infringing

product has not yet launched, as in this case, there is "no opportunity" to prove evidence of actual confusion, and that factor may be disregarded. *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir. 1997).

### 1.  The CRUISE Marks are Valid and Protectable.

GM and Cruise have valid and protectable trademark rights in their respective SUPER CRUISE and CRUISE marks.  In addition to its registered SUPER CRUISE mark, GM has pending intent-to-use applications for other CRUISE-formative marks, including ULTRA CRUISE, HYPER CRUISE, and DYNACRUISE, all of which will have priority dates based on their applications once GM uses them and they mature into registrations.  (Gorbatoff Decl., ¶¶ 2-6.)  Even without any federal registrations, however, GM has strong, valid common law rights in SUPER CRUISE through its consistent, nationwide use of that mark in connection with its semi-autonomous driving technology since at least 2017—long before Ford decided to rebrand its "Active Drive Assist" technology as "BlueCruise."  (Sledziewski Decl., ¶¶ 4-10.)

Likewise, Cruise has valid and protectable trademark rights in its CRUISE marks, including federal registrations for CRUISE and CRUISE FOR GOOD.  (*See* Boyden Decl., ¶ 15, Ex. F.) Cruise also has pending intent-to-use applications for CRUISE (in connection with additional goods and services), CRUISE AV, CRUISE FUTUREWORKS, and CRUISE ORIGIN.  (*Id*. ¶ 16, Ex. G.) Cruise has used the CRUISE-related marks in connection with its goods and services since 2013, including by displaying the CRUISE mark on the fleet of cars that do test drives daily in San Francisco and other cities.  (*See id*., ¶¶ 4, 7.)

The registered marks of GM and Cruise serve as "'constructive notice of the registrant's claim of ownership' of the mark," and "'prima facie evidence of the validity of the registered mark.'" *Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017) (quoting 15 U.S.C. §§ 1057(b) & 1072).  The fact of registration also confirms, without proof of secondary meaning, that the SUPER CRUISE and CRUISE marks are inherently distinctive—i.e., suggestive in that they require consumers to exercise some imagination to connect them to the products, not merely descriptive.  *See id.*; *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) ("a suggestive mark will be protected without proof of secondary meaning"); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768–769 (1992)

("[Suggestive] marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection"; they do not require showing they have "acquired distinctiveness through secondary meaning").

### 2. Ford's Use of "BlueCruise" is Likely to Cause Confusion.

Ford's "BlueCruise" branded product will cause confusion and harm. Likelihood of confusion is assessed using the non-exhaustive *Sleekcraft* factors: (1) strength of the marks; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) the defendants' intent; and (8) likelihood of expansion. *E.g., Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) (citing *Sleekcraft*, 599 F.2d 341 (9th Cir. 1979)). A factor by factor discussion follows below in subsection c.

### a. *"BlueCruise" Will Cause Forward Confusion.*

In the classic forward confusion case, consumers associate the junior user's goods and services with the senior user and its goods and services. Ford's use of "BlueCruise" is likely to cause *forward* confusion with GM and its SUPER CRUISE technology, as GM's mark is strong, the goods and services are nearly identical, the companies are direct competitors and market their products in identical channels, and Ford's conduct strongly suggests an intentional effort to trade on GM's success. *JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1106 (9th Cir. 2016). While automated driving technology is relatively new, GM has been at the forefront of its development, and its SUPER CRUISE technology is well-known and unrivaled among the major (and not-so-major) automobile manufacturers. Indeed, the tech and automotive industry press alike have lauded GM's SUPER CRUISE technology, comparing it favorably time and again to that of Tesla. (*See* Sledziewski Decl., ¶¶ 5-10.) GM's SUPER CRUISE mark is strong, and the technology for which it is used is very highly regarded.

Ford has not demonstrated the same leadership in automated driving technology as GM has, but it is evidently now attempting to offer competitive capability through the technology it plans to call "BlueCruise". The seeming similarity in technology, as well as Ford's sudden change to a new, similar-sounding name, has not been lost on the automotive and tech media. *Motor1.com*

1    commented on "Ford's curiously named BlueCruise" in comparing it to Tesla's Autopilot and GM's

2    Super Cruise.  (Wind Decl., ¶ 48.)  As *Motor Trend* commented, "Ford's forthcoming Level 2 hands-

3    free driver assist system is abandoning the Active Drive Assist moniker in favor of something with

4    a little more flair.  Meet BlueCruise, the Blue Oval's answer to similar Level 2 setups from the likes

5    of Tesla (Autopilot) and General Motors (Super Cruise)."  (*Id.*, n.55; Doolittle Decl., Ex. E.)  *Ars*

6    *Technica* similarly compared Ford's "BlueCruise" technology to "General Motors' highly rated

7    Super Cruise system," noting that it was "[o]riginally known as Active Drive Assist, [and] renamed

8    BlueCruise."  (Doolittle Decl., Ex. F.)  Ford's use of a similar sounding name for nearly identical

9    sounding technology is bound to cause classic, forward confusion by misleading consumers into

10   believing that Ford's technology is related to GM's, when it is not.

11                      ***b.    "BlueCruise" Will Cause Reverse Confusion.***

12          Trademark law also guards against reverse confusion.  This confusion arises in a different

13   manner than through classic forward confusion.  In reverse confusion, the senior, or earlier, user of

14   the mark is often smaller and not significantly established in the market as it is in forward

15   confusion.  However, the junior, or later, user of the mark is often large and very prominent in the

16   market.  Reverse confusion typically occurs when this significantly larger or more prominent junior

17   user "saturates the market" with use of a mark confusingly similar to that of the smaller, senior user,

18   swamping the consumer recognition of the smaller, senior user's mark and causing

19   confusion.  *Dreamwerks Production Group, Inc., v. SKG Studio*, 142 F.3d 1127, 1130 n.5 (9th Cir.

20   1998).  Accordingly, in the reverse confusion context, the *Sleekcraft* factors are somewhat

21   modified.  For example, the strength factor looks at whether the relative commercial "strength of

22   the mark" of the junior user will overwhelm the senior user.  The "defendant's intent" factor is

23   evaluated not to determine whether it intended to cause confusion, but whether, even if acting

24   innocently, the junior user was careless in failing to avoid infringement.  *Id.*

25          Because of Ford's indisputably strong market power relative to Cruise, the proximity of the

26   goods in the field of automated driving technology, the similarity of the marks such that Ford's

27   "BlueCruise" encompasses the entirety of Cruise's core trademark and brand identity, and the

28   overlapping marketing channels to the public, Ford's disregard of Cruise's preexisting rights would

scramble and dilute Cruise's efforts to firmly establish its own distinct national identity.  Moreover, the likelihood of further overlap and convergence in the companies' products as automated driving technology becomes more advanced virtually ensures that, reverse confusion, whereby Cruise will be falsely associated with Ford, will occur.

Ford's plan for "BlueCruise" is also likely to cause reverse confusion with GM's SUPER CRUISE and with both Plaintiffs' plans to expand their use of their CRUISE-formative marks.  While GM is not the stereotypical small company that experiences reverse confusion, GM has—until this year—limited its use of the SUPER CRUISE trademark to a single Cadillac model, and is now in the process of expanding its use to other models and brands.  A marketing blitz by Ford—which is likely given its goal of 100,000 cars—threatens to swamp both GM and Cruise's expansion plans, producing the precise result trademark law is designed to prevent.

> c.      **The Sleekcraft Factors Confirm "BlueCruise" Will Cause A Likelihood of Confusion with both GM and Cruise.**
>
>> i.      **The Strength of the Mark Factor Favors GM and Cruise, For Both Forward and Reverse Confusion.**

In a traditional forward confusion case, courts examine the strength of the plaintiff's mark to determine the scope of trademark protection to which the mark is entitled.  *E.g.*, *Sleekcraft*, 599 F.2d at 350.  As the uniqueness of the mark increases, so too does the degree of protection.  *Id*.  A mark's strength is "evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).  Consequently, for GM's claim of forward confusion, the Court evaluates the conceptual and commercial strength of its SUPER CRUISE marks to determine whether consumers will believe there is an association between GM's products and Ford's.

A mark's conceptual strength "depends largely on the obviousness of its connection to the good or service to which it refers." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032–33 (9th Cir. 2010).  Courts classify marks along a spectrum, ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic.  *Network Automation*, 638 F.3d at 1149.  Arbitrary and fanciful marks, which employ words and phrases with no

1  commonly understood connection to the product, are the strongest categories.  *Fortune Dynamic*,

2  618 F.3d at 1034.  In the middle of the spectrum are suggestive marks, which suggest a product's

3  features, but require consumers to exercise some imagination to associate the suggestive mark with

4  the product.  *Id.* at 1033 (*citing Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114

5  (9th Cir. 2010)).[1]  Descriptive marks define a particular characteristic of the product in a way that

6  does not require any imagination, while generic marks describe the product in its entirety and are

7  not entitled to trademark protection.  *Id.*[2]

8       After determining the mark's conceptual classification, the court determines the mark's

9  commercial strength.  *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th

10  Cir. 1988), abrogated in part on other grounds by *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d

11  1114, 1116 n.1 (9th Cir. 1990).  Commercial strength "is based on actual marketplace recognition."

12  *Network Automation*, 638 F.3d at 1149 (citation omitted).  As a result, advertising expenditures,

13  which increase marketplace recognition, offer evidence of commercial strength and "can transform

14  a suggestive mark into a strong mark."  *Id.* (citation omitted).

15       SUPER CRUISE has inherently moderate conceptual strength, as it is at least suggestive and

16  its commercial strength is growing as automated driving technology becomes more popular.  While

17  Ford will potentially argue otherwise, SUPER CRUISE is not descriptive or generic, as it does not

18  describe the technology at all and requires consumer imagination to associate the mark with GM's

19  technology.  *Fortune Dynamic, Inc.*, 618 F.3d at 1034.  GM's SUPER CRUISE technology has

20  earned substantial industry respect and the market for its technology is growing with the continued

21  acceptance among consumers of its safety.  (*See* Sledziewski Decl., ¶¶ 5-10; Maiorana Decl., ¶¶ 4-

22  5.)  In assessing forward confusion, the strength of GM's mark weighs in its favor.

23

24  [1]     Marks found to be suggestive include SPEEDI BAKE for frozen bread dough, NOBURST

25  for liquid antifreeze used in water heating systems, and DRI-FOOT for anti-perspirant foot
     deodorant.  *See* Trademark Manual of Examining Procedure ("TMEP") § 1209.01(a) (collecting

26  cases).  Each of these marks was found merely to suggest a desirable characteristic of the product
     without overtly referring to or describing the item itself.

27  [2]     Marks found to be descriptive include BED & BREAKFAST REGISTRY for lodging
     reservation services, MOUNTAIN CAMPER for a camping equipment retailer, and OATNUT for

28  bread made with oats and nuts.   See TMEP § 1209.01(b) (collecting cases); McCarthy on
     Trademarks and Unfair Competition, § 11:16 (5th ed.) (same).

Cruise's mark is not yet strong as its technology is not yet commercially available, but that is precisely why Ford's use of BlueCruise is so problematic.  In evaluating the commercial strength of a junior mark in a reverse confusion case, "the important question . . . is 'whether the junior mark is so [commercially] strong as to overtake the senior mark." *Ironhawk Technologies, Inc. v. Dropbox, Inc.*, 994 F.3d 1107, 1119 (9th Cir. 2021) (brackets in original) (quoting *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000)).  In making that determination, advertising and marketing campaigns by the junior user, here Ford, are considered because "the greater the power of [the junior user's] mark in the marketplace, the more likely it is to capture the minds of [the senior user's] customers." *Dreamwerks*, 142 F.3d at 1130 n. 5.  The "massive marketing muscle [a junior user] flexes in ensuring that [it] leaves an imprint on the consuming public" can overwhelm the smaller senior user and cause reverse confusion.  *Masters Software, Inc. v. Discovery Communications, Inc.*, 725 F.Supp.2d 1294, 1300 (W.D. Wa., Jul. 16, 2010); *see La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876 (9th Cir. 2014).  Thus, any assertion by Ford that the CRUISE mark is not strong is irrelevant; Ford's commercial strength is what matters in analyzing reverse confusion.

On this point, *Masters Software, Inc. v. Discovery Communications, Inc.*, is instructive.  There, the senior user plaintiff developed software to assist professional cake bakers with business management; she named the software "CakeBoss" and licensed it to users on her website www.CakeBoss.com.  725 F.Supp.2d at 1296.  When she saw that The Learning Channel was introducing a reality television show about a professional baker in New Jersey called "Cake Boss," she brought a claim for trademark infringement and sought a preliminary injunction.  *Id*. at 1297.  The court noted that plaintiff's business was a small one without broad renown, and if analyzed alone, her mark may have been suggestive, weak, and "undeserving of protection." *Id*. at 1300.  In contrast, the commercial strength of the junior mark was very strong — using millions of dollars in development, production, and promotion, the defendant advertised the junior mark "repeatedly on national television," and had an "ability to saturate the marketplace" and overwhelm the senior user, thereby effectively commandeering the mark, and entitling the plaintiff to injunctive relief.  *Id*.

The same is true here.  Ford was founded in 1903 and has long been one of the largest companies in the world; it currently ranks number 21 in the Fortune 500 list of largest U.S. companies and has a market value of nearly $60 billion.  (Doolittle Decl., Exs. G, H.)  More than two million Ford vehicles are sold each year in the United States.  (Wind Decl., ¶ 66.)  The Ford F-series truck is the top selling vehicle in the United States in 2021 so far.  (Doolittle Decl., Ex. I.)

In 2019, Ford spent $2.28 billion just on advertising.  (*Id.*, Ex. J.)  According to Ford's April 2021 press release, Ford aims to sell at least 100,000 vehicles equipped with BlueCruise in the first year alone, in addition to sending its software to numerous other vehicles already on the road.  (Wind Decl., Ex. B.)  That goal will not be met without saturating the market with references to the infringing "BlueCruise" branded technology.

Cruise is a much younger—and far smaller—company.  (*See* Boyden Decl., ¶¶ 3, 4, 10.)  Despite having begun to make a name for itself in the autonomous vehicle industry in less than a decade, Cruise is not (yet) an immediately recognizable brand among the general public.  Cruise is not a household name like Ford, nor does Cruise have the resources to quickly out-advertise Ford to protect the CRUISE family of marks.  (*Id.*, ¶ 11.)  Like GM, Cruise acted with urgency upon learning of Ford's intended use to seek a resolution before BlueCruise gained any more publicity through Ford's overwhelming market presence.  (*See* Doolittle Decl., ¶ 2, Ex. A.)

### ii.     The Relatedness of the Goods Factor Favors GM and Cruise.

Where goods are "related or complementary," the danger of consumer confusion is heightened.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992).  To be considered related or complementary, the goods need not be identical or even directly competitive, but must exist in the market such that they could be encountered by the same purchaser under circumstances that could give rise to the reasonable but mistaken belief that they share a common source or association.  *See, e.g.*, *Sleekcraft*, 599 F.2d at 350.

There is no question that Ford's BlueCruise offering is "related" to GM's SUPER CRUISE; they are directly competitive.  (Sledziewski Decl., ¶ 11.)  As for Cruise, the goods are also related.  Cruise associates its brand solely with automated driving technology and products (Boyden Decl.,

¶¶ 4, 8), and Ford is threatening to use the "BlueCruise" name for an automated driving product (Wind Decl., Ex. B).   Indeed, even seemingly distinct products have been found to be complementary or related where they target the same consumers (as with women's shoes and women's clothing, and similar solar technology products), are sold to an overlapping market niche (as with bakery management software and a reality television show about a bakery), or are on display in the same area of a store (as with wine, cheese, and salami). *Fortune Dynamic*, 618 F.3d 1035; *Palantir Techs. Inc. v. Palantir.net, Inc.*, 2008 U.S. Dist. LEXIS 6448, at *14–15 (N.D. Cal. 2008); *Masters Software*, 725 F.Supp.2d 1294; *E. & J. Gallo Winery*, 967 F.2d 1280.

### iii.   The Similarity of the Marks Factor Favors GM and Cruise.

Marks are confusingly similar when they have similar sound, sight, and meaning. *Sleekcraft*, 599 F.2d at 350.  When two parties both rely on the same "dominant word," the two marks are often found to be similar in sight, sound, and meaning, even though the junior user may present the "dominant word" with other elements. *La Quinta Worldwide*, 762 F.3d at 876 (affirming similarity of "La Quinta" and "Quinta Real," which "shared a similar meaning … and an identical dominant word: 'Quinta'"); *Cyto Sport, Inc. v. Vital Pharm., Inc*, 617 F.Supp.2d 1051, 1066 (E.D. Cal. May 6, 2009) (marks "Muscle Milk" and "Muscle Power" were similar because they both comprised a two-word composite trademark beginning with "muscle").

"BlueCruise" is confusingly similar to CRUISE, SUPER CRUISE, and the family of CRUISE-formative marks that GM and Cruise have developed, and Ford's co-branding makes the situation worse.  (Wind Decl. ¶¶ 52-90.)  Even where marks have different secondary words, differing numbers of syllables, or different lengths, the presence of the same root word "introduces a strong similarity in [the] marks." *Bose Corp. v. QSC Audio Products, Inc.*, 293 F.3d 1367, 1378 (Fed. Cir. 2002) (in comparing "Wave" and "Acoustic Wave" with "Powerwave," the court determined that the "presence of the root element WAVE . . . introduces a strong similarity in all three marks.")  "BlueCruise" is obviously similar to CRUISE, SUPER CRUISE, and the family of CRUISE-formative marks GM and Cruise have developed because they share the dominant word "cruise."  (Wind Decl. ¶¶ 53, 88.)  The shared root word "cruise" is a connection only strengthened

1   by the similarity in the products.  *La Quinta Worldwide*, 762 F.3d at 876.

2        The similarity in marks is not just limited to the eye or ear.  The impact and imagery evoked

3   by the respective marks can also be considered.  *Sleekcraft*, 599 F.2d at 350.  Any imagery that

4   CRUISE elicits in this context—e.g., that of effortlessly smooth movement (as in a leisurely cruise

5   on a boat)— does not change simply because Ford has tacked on the appendage "Blue."  The

6   identical feeling evoked by the words "BlueCruise," "Super Cruise," and "Cruise," especially given

7   the relatedness of goods in the marketplace, increases the likelihood of confusion.

8                       **iv.**     **The Evidence of Actual Confusion Factor is Neutral.**

9        Because Ford's "BlueCruise" is not yet available, the absence of actual confusion is a neutral

10   factor that cannot weigh against GM or Cruise.  A lack of actual confusion will not count against a

11   plaintiff where the defendant has only recently begun selling or promoting goods with the mark at

12   issue.  *Sleekcraft*, 599 F.2d at 352; *see also Brookfield*, 174 F.3d at 1050 ("[D]ifficulties in gathering

13   evidence of actual confusion," including because a product is not yet in the marketplace, "make its

14   absence generally unnoteworthy."); *Dr. Seuss*, 109 F.3d at 1405 (9th Cir. 1997) (affirming

15   preliminary injunction where "there has been no opportunity to prove confusion in the marketplace"

16   because defendant's book was not yet being sold).

17        Indeed, the very purpose of bringing this motion before Ford releases its BlueCruise system

18   is to prevent actual confusion from occurring.  The speed of GM and Cruise's action do not weigh

19   against them.  *E.g., Ironhawk*, 994 F.3d at 1122 (finding that this factor is only weighed heavily

20   when the particular circumstances indicate that such evidence should have been available); *Vertos*

21   *Medical, Inc. v. Globus Medical, Inc.*, 2009 WL 3740709, *7 (N.D. Cal., 2009) (determining that

22   where actual confusion is difficult to prove because there is an absence of such evidence, this factor

23   is not dispositive and should be accorded less weight); *see also* Wind Decl. ¶¶ 84-86 (referring to

24   early instances of confusion based on name alone), ¶¶ 5, 87 (discussing context before Ford starts

25   selling).

26                       **v.**     **The Marketing Channels Factor Favors GM and Cruise.**

27        "In assessing marketing channel convergence, courts consider whether the parties' customer

28   bases overlap and how the parties advertise and market their products."  *Ironhawk* , 994 F.3d 1107

1   (quoting *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014)); *Premier Electronics*

2   *Laboratory, Inc v. Aston*, 914 F.2d 1496, *3 (9th Cir. 1990) ("[C]ourts examine the proximity of the

3   marketing channels to one another and whether direct competition exists."); *Lindy Pen Co., Inc. v.*

4   *Bic Pen Corp.*, 796 F.2d 254, 257 (9th Cir. 1986) ("overwhelming likelihood of confusion result[ed]

5   from the direct competition of pens with virtually identical marks").

6         There is no dispute that Ford markets broadly in every major channel available, spending

7   several *billion* dollars annually in advertising.  (*See* Wind Decl., ¶¶ 66-70.)  Ford marketing is

8   everywhere: on television, in major magazines and newspapers, on countless webpages, and on

9   billboards in cities, towns, and along highways across the country.  (*Id.*)

10        In addition to the impact of its traditional marketing efforts, a person cannot go far without

11   encountering Ford's brand:  indeed, there are over 3,000 Ford retail locations across 2,326 American

12   cities.  (*Id.*)

13        Even though Ford has only recently decided to use the "BlueCruise" name on future

14   products, its press release revealing the BlueCruise navigation system has already received

15   considerable attention in the news, including blog posts, YouTube videos, and popular online

16   publications like *Ars Technica*, *AutoWeek*, *MotorTrend*, and more.  (*Id.*, ¶ 48; Doolittle Decl., Exs.

17   E, F, K.)  Such coverage portends even more widespread marketing when Ford's BlueCruise product

18   comes to market, rendering the need to prove "overlap" of the marketing channels used by Ford,

19   GM, and Cruise unnecessary; it is presumed that a consumer could reasonably be confused even if

20   Ford never advertised in the exact same publication as GM or Cruise.  But they will.  Ford and GM

21   are direct competitors, and they advertise in *exactly* the same marketing channels.  GM markets the

22   vehicles in which it offers SUPER CRUISE technology on national television, in major magazines

23   and newspapers, online (including on YouTube), and in industry publications such as *Car and*

24   *Driver* and *MotorTrend*, as well as a myriad of other well known, national outlets.  (Sledziewski

25   Decl., ¶¶ 4-6, 10.)  GM's SUPER CRUISE technology is also featured in tech-oriented publications

26   such as *Popular Mechanics.*  (*Id.*, ¶¶ 5-10.)

27        Although Cruise's marketing footprint is far smaller, it too uses the internet and television

28   appearances to market its products and technology.  (Boyden Decl., ¶ 13.)  Cruise's website contains

a host of information about the company, and its executives have appeared in media articles and news shows to highlight Cruise's work in automated driving. *Id*. Moreover, where a smaller, senior user's marketing channels are limited and the junior user's media exposure is so "widespread" and "massive" that it "permeate[s] virtually every marketing channel," this factor favors the senior user even if it is unlikely that a consumer would ever encounter the products in precisely the same marketing channel. *Masters Software, Inc.*, 725 F.Supp.2d at 1305.

With Ford present in all major marketing channels and, indeed, in the very same channels as GM, and with Ford able to quickly swamp Cruise's growing brand awareness (*see* Wind Decl. ¶¶ 66-71, 93), this factor weighs heavily in GM's and Cruise's favor.

> ### vi.     The Degree of Consumer Care Factor Favors GM and Cruise.

The consumer care element evaluates whether a typical consumer exercising ordinary caution is likely to be confused. *Sleekcraft*, 599 F.2d at 353. While those buying vehicles are likely to act with more care than those making a less expensive purchase, "[s]ophistication does not preclude a likelihood of confusion." *Charles Schwab & Co., Inc. v. Hiberia Bank*, 665 F.Supp. 800, 811 (N.D. Cal. 1987). Further, expensive goods are more likely to cause confusion when the marks and goods at issue are closely related. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1120–21 (6th Cir. 1996).

Here, the sophistication of those interested in autonomous vehicles and automated driving technology makes it *more* likely they will mistakenly connect Ford to GM and Cruise's CRUISE marks and vice versa, not less. In *Charles Schwab*, for example, the court recognized that sophistication could actually drive consumer confusion. 665 F.Supp. at 810-11. In that case, the parties agreed that the likely purchasers of their products were sophisticated professionals such as doctors, executives, and traders who would only buy the goods "upon careful consideration." *Id*. Still, the court determined that, in part *due* to the consumers' sophistication, they were more likely to be aware of ongoing divestiture, deregulation, and diversification of the financial services industry, and as a result their sophistication might lead them to assume there was a connection between the two products: one, a computer program providing customers with financial information,

services, and opportunities, and two, a bank's home equity line of credit.  *Id*.

Here, the same is true—sophisticated consumers, even those preparing to make a purchase of a vehicle with automated driving capabilities—could well be aware that a vehicle's make and model can be entirely distinct from the source of the software that helps it drive unassisted.  (Wind Decl. ¶¶ 62-64.)  Vehicles often come installed with third party products, such as Apple CarPlay, Sirius XM radio, Bose speakers, Cummins diesel engines, Michelin high performance tires, Google maps, and so on.  (*Id.*)  A savvy consumer aware of Cruise's work in automated driving could reasonably (and mistakenly) assume that Cruise was the source of the "BlueCruise" software, or that "BlueCruise" shares the same source as GM's SUPER CRUISE.  (*Id.*)  The consumer would wrongly assume that an association between Ford and Cruise and/or GM or its supplier had allowed Ford to make cars, like the classic Mustang, able to drive autonomously on Ford's Blue Highway system using a related automated driving technology.  (*Id.*)  This factor also weighs in GM and Cruise's favor.

### vii.     Ford's Intent Favors GM and Cruise.

Ford's intent in choosing and sticking with the BlueCruise mark is further evidence of a likelihood of confusion.  First, as an automobile industry participant, Ford has been aware of GM and Cruise and the CRUISE marks for years.  Ford is particularly knowledgeable about the autonomous vehicle field through its multi-billion dollar investment in Argo AI, a company with an office, like Cruise, in the Bay Area, and devoted, like Cruise, to developing automated driving technology.  (Boyden Decl., ¶ 17, Ex. H.)

Ford was also on constructive notice of the registered SUPER CRUISE and CRUISE marks since at least January 2018 and March 2020, respectively, when marks were registered.  *See Matal*, 137 S. Ct. at 1753.  Ford was put on further notice when GM and Cruise swiftly called Ford's attention to this dispute after Ford's press release announced the "BlueCruise" name and system.  (Doolittle Decl., ¶ 2, Ex. A.)  Despite this knowledge, Ford continues to use the "BlueCruise" mark.

Ford's bad intent is further shown by the myriad alternative names it could easily switch to at this early stage before it expends any additional money building a brand name for the as-yet-unreleased software.  For instance, Ford announced at least as early as October 2020 that the

automated driving system would be branded as "Active Drive Assist" in the Co-Pilot360 system. (*Id.*, Ex. C.)  Ford is also already releasing the same technology under the name "ActiveGlide" in at least one other vehicle line, and has filed a trademark application for that mark.  (*Id.*, Ex. B.)  Ford could also select one of countless alternatives such as BlueGlide, BlueForward, BlueFree, or FordFree.  *Notably, no other car manufacturer has felt the need to use "Cruise" to brand its automated driving technology.*  For example, Hyundai uses SmartSense, Lexus uses CoDrive, Toyota uses Guardian, BMW uses Personal CoPilot, Tesla uses Autopilot, Waymo uses the Waymo Driver, and Nissan uses ProPilot.  Nonetheless, despite the countless unique names it could have chosen, Ford chose to adopt a name closely associated with GM and Cruise.  (Wind Decl. ¶¶ 107-109.)  There is virtually no cost to Ford to make a name change now, in contrast to the likely irreparable harm to GM and Cruise if Ford is allowed to press forward.   (*Id.*, 91-101, 107, 111.)  Ford's obstinacy despite all this reveals a knowing intent to use a mark that incorporates Cruise's core brand identity as well as the core of a mark GM has used for nearly a decade.  (*See* Boyden Decl., ¶ 17; Doolittle Decl., ¶ 2, Ex. A.)  This factor weighs heavily in Plaintiffs' favor.

### viii.    The Likelihood of Expansion Factor is Irrelevant.

When goods "are already related" or the parties "sell similar products," the likelihood of expansion is "irrelevant."  *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1029 (9th Cir. 2004); *Karl Storz Imaging, Inc. v. Pointe Conception Medical, Inc.*, 2011 WL 13195980, *19 (C.D. Cal. Aug. 1, 2011); *see also SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 2013 WL 4528539, *16 (N.D. Cal. 2013) (quoting *Sleekcraft*, 599 F.2d at 354).  All parties are using their respective marks in connection with automated driving technology.  (Gorbatoff Decl. ¶¶ 2-6; Boyden Decl., ¶ 15, Ex. F.)

### B.    Plaintiffs Will Suffer Irreparable Harm Without an Injunction.

Any act that inflicts "cognizable irreparable injury" is sufficient to support an injunction. *M.R. v. Dreyfus*, 697 F.3d 706, 728-729 (9th Cir. 2012).  The irreparable harm need only be likely, not certain, to occur.  *Michigan v. United States Army Corp. of Engineers*, 667 F.3d 765, 787-88 (7th Cir. 2011).

1

**1.      Irreparable Harm is Presumed.**

2        With the implementation of the Trademark Modernization Act of 2020, plaintiffs who show

3   a likelihood of success on the merits of a trademark infringement claim are presumed at the

4   preliminary injunction stage to be suffering irreparable injury.  15 U.S.C. § 1116(a).  Thus, GM and

5   Cruise are presumed to be suffering irreparable injury.

6

**2.      Ford's Use of "BlueCruise" Irreparably Harms Plaintiffs' Ability to**

7

**Control Their Reputations and Goodwill.**

8        In addition to the presumption of irreparable injury, damage to a company's reputation or

9   goodwill are both sufficient to constitute irreparable injury.  *United Healthcare Ins. Co. v. Advance-*

10  *PCS*, 316 F.3d 737, 741 (8th Cir. 2002); *see also Optinrealbig.com, LLC v. Ironport Systems, Inc.*,

11  323 F.Supp.2d 1037, 1050 (N.D. Cal. 2004) (stating "[d]amage to a business' goodwill is typically

12  an irreparable injury because it is difficult to calculate."); *AECOM Energy and Construction, Inv.*

13  *v. Morrison Knudsen Corp.*, 748 Fed. Appx. 115, 119 (9th Cir. 2018) (affirming injunction where,

14  without it, plaintiff "will lose control over the . . . brand for which it paid substantial consideration").

15  Because it is well established that consumer confusion and injury to business goodwill constitute

16  irreparable harm, courts have long granted preliminary injunctions in trademark cases.  *See, e.g.*,

17  *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012-14 (C.D. Cal. 2011).  Here,

18  the likelihood of consumer confusion and injury to goodwill is sufficient to demonstrate irreparable

19  harm.

20        Permitting Ford to use "BlueCruise" irreparably harms GM and Cruise.  It will cause them

21  to lose exclusive control of their reputations and goodwill due to the inevitable association with

22  "BlueCruise" and deprive them of the ability to grow their businesses without such false

23  association.  (Wind Decl., ¶¶ 91- 93, 101.)  They will also be unable to monitor or affect the quality,

24  safety, or marketing of the product Ford intends to release using the CRUISE mark.  (*Id.*, ¶¶ 93-

25  101.)  This is always harmful.  *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,

26  944 F.2d 597, 603 (9th Cir. 1991) (irreparable harm can be found when protection is sought for

27  advertising efforts, goodwill, and recruitment efforts); *Regents of University of California v.*

28  *American Broadcasting Companies, Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (affirming preliminary

injunction where injury included impairment of recruitment programs, community goodwill and support garnered over the years; deprivation of the opportunity to have a moment in the industry; and a reduction in the attractiveness of the product which would "doom [its] efforts to compete in the market").

The loss of reputational control is particularly problematic in an industry such as the automated driving market, which is relatively new, as many members of the public are only now becoming aware of the participants in the field. (Zhang Decl., ¶ 7; Wind Decl., ¶¶ 17-20, 29, 64, 93-101.) Many people are still skeptical about the industry and the safety of autonomous vehicles. (*Id.*) Therefore, associating a brand with best-in-class automated driving technology that is safe is essential to success. (Zhang Decl., ¶ 7; Boyden Decl. ¶ 8; Wind Decl., ¶¶ 29, 43-46, 92-94.) Plaintiffs have invested heavily in their efforts to do so. (Zhang Decl., ¶ 7; Boyden Decl., ¶ 11; Sledziewski Decl., ¶¶ 4-6; Maiorana Decl., ¶ 4.) GM and Cruise have devoted significant resources, including many millions of dollars, to developing goodwill among the public as being firmly committed to developing safe and reliable autonomous vehicles. (Zhang Decl. ¶ 7; Boyden Decl., ¶ 9; Sledziewski Decl., ¶¶ 4-6; Maiorana Decl., ¶ 4.) Their investments in building a positive association around their marks has paid off with recognition and positive publicity for their work and leadership in the industry. (*See* Boyden Decl., Ex. 12; Sledziewski Decl., ¶¶ 5-10; Maiorana Decl., ¶ 5; Wind Decl., ¶ 36-44.) Especially given the relatively early stages of the automated driving industry, harm to their reputation and goodwill is impossible to quantify. (Wind Decl., ¶ 64, 91-101, 114.)

Further, Cruise is developing technology that is categorized at a higher level of automation than Ford's "BlueCruise" technology. Cruise has developed advanced technology for rideshare and delivery in complex urban environments, and is a rival to the Ford-backed company, Argo AI, another participant in the autonomous vehicle industry. (*See* Zhang Decl., ¶ 17; Boyden Decl., ¶ 17.) Ford's intended use of "BlueCruise" will lead consumers to think Cruise is a supplier of Ford's lower level systems, rather than a producer of higher level automated driving technology. (Wind Decl., ¶¶ 63, 81; *see also id.* ¶¶ 94, 101 (describing additional reputational harm).) Courts recognize that such an erosion of reputational standing is sufficient to show irreparable harm. *See Ticor Title*

*Ins. Co. v. Cohen*, 173 F.3d 63, 68-70 (2d Cir. 1999). Cruise has no adequate remedy at law to compensate it for the loss of business reputation, customers, market position, and goodwill likely to flow from Defendant's infringing activities.

Finally, in addition to the clear impact on consumers, the confusion of "vendors, suppliers, potential employees, investors, and similar groups of non-consumers" is also a source of irreparable harm. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190,1214 n.9 (9th Cir. 2012). Cruise's goodwill is crucial for its ability to attract talented employees in the field. (Boyden Decl., ¶ 10.)

\*     \*     \*

GM and Cruise have no adequate remedy at law to compensate them for the loss of business reputation, customers, market position, and goodwill likely to flow from Ford's infringing activities. With Ford's refusal to rebrand its product following lengthy settlement discussions (Doolittle Decl., ¶ 5), it is clear that Ford has no near-term or future plans to cease its infringement. Without an immediate preliminary injunction, the immeasurable irreparable harm will continue. (*See* Wind Decl., ¶¶ 91-101, 110-114.)

**C.      The Public Interest Strongly Favors an Injunction.**

The public interest is best served by "vindicating intellectual property rights, and [] prohibiting unfair competition." *Niantic, Inc. v. Global++*, 2019 WL 8333451, *9 (N.D. Cal. Sept. 26, 2019). In trademark cases, "the usual public interest concern . . . [is] avoiding confusion to consumers." *Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 993 (9th Cir. 2009).[3]

Ford may attempt to argue that the public interest will not be served by an injunction because Cruise is not yet a well-known brand, but that is wrong; the public interest is served by protecting emerging marks just like established marks. *See, e.g.*, *In re Shell Oil Co.*, 992 F.2d 1204, 1207-08 (Fed. Cir. 1993) ("A newcomer does not gain the right to register a substantially identical mark

---

[3] Vindicating Cruise's intellectual property rights also serves to protect the other ways in which Cruise exists to serve the public interest, such as its commitment to clean energy. (*See* Boyden Decl., ¶ 12, Ex. A.)

1  simply because the number of persons exposed to the registrant's mark may be small in relation to

2  the newcomer's volume of use.").

3  GM and Cruise have followed the rules in developing their CRUISE-related marks.  They

4  have used them in commerce, sought and obtained trademark registrations, and invested in them.  It

5  is not in the public's interest to reward Ford's disregard of existing trademarks, or reinforce its

6  position that it may unilaterally decide which trademarks it will respect and which it will ignore.

7  (*See also* Wind Decl. ¶¶ 102-106, 111, 114 (describing additional harm to consumers and society).)

8  **D.**   **The Balance of Equities Strongly Favors an Injunction.**

9  In considering an injunction, a court evaluates the degree of harm on each party if the

10  injunction is improperly granted or denied.  Here, the balance of equities favors granting GM and

11  Cruise their requested relief because they seek "no more than requir[ing] Defendant to comply with

12  . . . laws."  *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016).

13  As the unauthorized junior user of a registered mark, Ford never had a right to use the

14  CRUISE mark in the first place, so there is no disservice in entering a preliminary injunction against

15  it.  Ford just announced that it will be releasing the BlueCruise product in the future.  (Wind Decl.,

16  Ex. B.)  There is ample time for Ford to change the name with minimal impact on its business—

17  indeed, it has already done this.  (*See* Doolittle Decl., Ex. B; Wind Decl. ¶¶ 107-111.)  Even in

18  situations where an injunction will cost the defendant certain profits, that harm is given little weight.

19  *See, e.g.*, *Niantic*, 2019 WL 8333451 at *9.  "Where the only hardship that the defendant will suffer

20  is lost profits from an activity which has been shown likely to be infringing, such an argument in

21  defense 'merits little equitable consideration.'"  *Concrete Mach. Co. v. Classic Lawn Ornaments,*

22  *Inc.*, 843 F.2d 600, 612 (1st Cir. 1988).  All the more here, where Ford stands to lose nothing by

23  making a name change now, rather than after a trial a year or two from now when it will have to

24  rebrand a system it has already started selling to consumers, and where it already uses other branding

25  for the same product on another vehicle line.

26  ## CONCLUSION

27  For the reasons above, Plaintiffs respectfully request that this Court preliminarily enjoin

28  Ford from using "BlueCruise" or any other "Cruise" name for its automated driving technology.

1

2

| DATED:  July 30, 2021 | | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
|---|---|---|
| | By | */s/ Diane M. Doolittle* |
| | | Diane M. Doolittle<br>*Attorneys for Plaintiffs Cruise LLC*<br>*and GM Cruise Holdings LLC* |

3

4

5

6

7

| DATED:  July 30, 2021 | | KIRKLAND & ELLIS, LLP |
|---|---|---|
| | By | */s/ Diana M. Torres* |
| | | Diana M. Torres<br>*Attorneys for Plaintiff General Motors LLC* |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>ATTESTATION</u>**

2        I, Kyle K. Batter, am the ECF user whose ID and password are being used to file the above

3 document.  In compliance with Local Rule 5-1(i)(3), I hereby attest that Diane M. Doolittle and

4 Diana M. Torres have concurred in the filing of the above document.

5

6                                        */s/ Kyle K. Batter*                    

7                                        Kyle K. Batter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION