KILPATRICK TOWNSEND & STOCKTON LLP
GREGORY S. GILCHRIST (State Bar No. 111536)
ggilchrist@kilpatricktownsend.com
GIA L. CINCONE (State Bar No. 141668)
gcincone@kilpatricktownsend.com
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111
Telephone:   (415) 576-0200
Facsimile:   (415) 576-0300

WILLIAM H. BREWSTER (admitted *pro hac vice*)
bbrewster@kilpatricktownsend.com
R. CHARLES HENN JR. (admitted *pro hac vice*)
chenn@kilpatricktownsend.com
NICHOLE DAVIS CHOLLET (admitted *pro hac vice*)
nchollet@kilpatricktownsend.com
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone:   (404) 815-6500
Facsimile:   (404) 815-6555

Attorneys for Defendant
FORD MOTOR COMPANY

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CRUISE LLC, a Delaware limited liability company, GM CRUISE HOLDINGS, LLC, a Delaware limited liability company, and GENERAL MOTORS LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> FORD MOTOR COMPANY, a Delaware corporation, <br><br> Defendant. | Case No. 3:21-CV-05685-SI <br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Date: Sept. 10, 2021 <br> Time: 10:00 a.m. <br> Ctrm: 1-17th Floor <br> Judge: Hon. Susan Illston <br><br> Complaint Filed: July 23, 2021 |

1

**TABLE OF CONTENTS**

2

Page

3

4

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ......................................................................................2

I.      "Cruise" Long Has Been A Standard Term Understood by Driving
        Consumers ..................................................................................................2

II.     Ford and Ford's BlueCruise Technology ...................................................3

III.    GM and GM's Super Cruise Technology ..................................................4

IV.     Cruise and Its Autonomous Robotaxis ......................................................5

ARGUMENT ..........................................................................................................6

I.      Plaintiffs are Not Likely to Succeed on the Merits ...................................6

        A.      Plaintiffs' Putative Cruise Marks Are Generic and Not
                Protectable ........................................................................................8

        B.      Plaintiffs' Marks Are At Best Descriptive and Lack Secondary
                Meaning and, Therefore, Are Not Protectable. ..............................10

                1.      "Cruise" and "Super Cruise" Are At Best Merely
                        Descriptive ...........................................................................10

                2.      Plaintiffs' Putative Cruise Marks Lack Secondary
                        Meaning .................................................................................12

        C.      Plaintiffs Cannot Prove Likely Confusion ....................................14

                1.      Purchasers Exercise A High Degree of Care ........................15

                2.      Plaintiffs' Marks Are Weak And Entitled To Little, If
                        Any, Protection .....................................................................16

                3.      Ford's BlueCruise Name Is Readily Distinguishable
                        From Super Cruise ................................................................17

                4.      No Evidence of Actual Confusion Exists, and Survey
                        Evidence Establishes that Forward Confusion is
                        Highly Unlikely .....................................................................18

                5.      Ford and GM Use Similar Marketing Channels, but
                        Entirely Different Distribution Channels ..............................19

                6.      Ford Selected And Adopted its Mark In Good Faith ............19

# TABLE OF CONTENTS
(continued)

Page

    7.  Ford's and GM's Goods Are Similar, but Not Interchangeable, and Expansion of Product Lines Is Not a Factor ............................................................................................20

   D.  Reverse Confusion is Highly Unlikely if Not Impossible ...............20

II.  Ford Would Suffer Massive Harm, including Irreparable Harm, if Enjoined, So that The Balance of Hardships Factor Tilts Strongly in Ford's Favor ............................................................................................23

III.  Plaintiffs Will Not Suffer Irreparable Harm By Ford's Use of BlueCruise ......................................................................................................24

IV.  Plaintiffs' Desired Monopoly of "Cruise" is Contrary to Public Policy .......................25

CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Advertise.com, Inc. v. AOL Advert., Inc.*,
   616 F.3d 974 (9th Cir. 2010) ...................................................... 8

*Allstate Ins. Co. v. Kia Motors Am., Inc.*,
   No. CV 16-06108 SJO, 2017 WL 10311211 (C.D. Cal. Sept. 0, 2017) ..................................... 18

*Alpha Indus. v. Alpha Steel Tube & Shapes, Inc.*,
   616 F.2d 440 (9th Cir. 1980) ....................................................... 16, 17, 19

*Art Attacks Ink, LLC v. MGA Ent. Inc.*,
   581 F.3d 1138 (9th Cir. 2009) ...................................................... 14

*Bada Co. v. Montgomery Ward & Co.*,
   426 F.2d 8 (9th Cir. 1970) ........................................................... 11

*Cairns v. Franklin Mint Co.*,
   24 F. Supp. 2d 1013 (C.D. Cal. 1998) ........................................ 19

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
   434 F.2d 794, 800 (9th Cir. 1970) .............................................. 14

*CG Roxane LLC v. Fiji Water Co.*,
   569 F. Supp. 2d 1019 (N.D. Cal. 2008) ................................ 9, 11, 14

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
   468 F. Supp. 2d 1181 (C.D. Cal. 2007) ..................................... 9, 25

*Closed Loop Mktg., Inc. v. Closed Loop Mktg., LLC*,
   589 F. Supp. 2d 1211 (E.D. Cal. 2008) ................................. 8, 9, 11

*Cohn v. Petsmart, Inc.*,
   281 F. 3d 837 (9th Cir. 2002) ........................................ 14, 18, 21, 22

*Creamette Co. v. Merlino*,
   299 F.2d 55 (9th Cir. 1962) ......................................................... 16

*Ctr. for Food Safety v. Vilsack*,
   636 F.3d 1166 (9th Cir. 2011) ..................................................... 24

*Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*,
   84 F.3d 1143 (9th Cir. 1996) ........................................................ 7

*Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*,
   448 F.3d 1118 (9th Cir. 2006) ................................................... 6, 14

# TABLE OF AUTHORITIES
(continued)

<u>Page</u>

*Dreamwerks Prods. Grp. v. SKG Studio*,
  142 F. 3d 1127 (9th Cir. 1998)............................................................................. 15, 20, 21

*EA Eng'g Sci. & Tech, Inc. v. Environ. Audit, Inc.*,
  703 F. Supp. 853 (C.D. Cal. 1989) .......................................................... 15, 20, 24, 25

*Elliott v. Google, Inc.*,
  860 F.3d 1151 (9th Cir. 2017)................................................................................... 10

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002)..................................................................... 11, 12, 25

*Excelligence Learning Corp. v. Oriental Trading Co.*,
  No. C 03-4947 JF, 2004 WL 2944048 (N.D. Cal. Dec. 20, 2004) ............................. 13

*Freelancer Int'l Pty Ltd. v. Upwork Glob., Inc.*,
  No. 20-cv-06132-SI, 2020 WL 6271030 (N.D. Cal. Oct. 23, 2020),
  *aff'd*, 851 F. App'x 409 (9th Cir. 2021)..................................................................... 6, 25

*FW OmniMedia Corp. v. Toyota Motor Sales, U.S.A., Inc.*,
  No. 04CV–8624 GPS, 2004 WL 3203134 (C.D. Cal. Dec. 8, 2004) ......................... 16

*Gap, Inc. v. G.A.P. Adventures*,
  No. 07 Civ. 9614 (AKH), 2011 WL 2946384 (S.D.N.Y. June 24, 2011)................... 24

*Glow Indus., Inc. v. Lopez*,
  252 F. Supp. 2d 962 (C.D. Cal. 2002)................................................................. 21, 24

*Herb Reed Enters. v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013)................................................................................... 25

*Home Decor Ctr., Inc. v. Google, Inc.*,
  No. CV 12-5706-GW(SHx), 2013 WL 10858861 (C.D. Cal. May 9, 2013)............... 10

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  756 F. Supp. 1292 (N.D. Cal. 1991) ......................................................................... 10

*Japan Telecom, Inc. v. Japan Telecom Am., Inc.*,
  287 F.3d 866 (9th Cir. 2002)........................................................................... 11, 12, 13

*JL Beverage Co. v. Beam, Inc.*,
  899 F. Supp. 2d 991 (D. Nev. 2012) .................................................................. 23, 25

*Kern v. Mindsource, Inc.*,
  225 F.3d 663 (9th Cir. 2000)..................................................................................... 19

**TABLE OF AUTHORITIES**
(continued)

Page

*KP Permanent Make-Up, Inc. v. Lasting Impression, I, Inc.*,
543 U.S. 111 (2004) .......................................................................................... 25

*Kroger Co. v. Lidl US, LLC*,
No. 3:17-cv-480-JAG, 2017 WL 3262253 (E.D. Va. July 31, 2017) .................................... 23, 25

*Lahoti v. VeriCheck, Inc.*,
586 F.3d 1190 (9th Cir. 2009) ............................................................................. 10, 11

*Levi Strauss & Co. v. Blue Bell, Inc.*,
778 F.2d 1352 (9th Cir. 1985) ............................................................................. 12, 13

*Levi Strauss & Co. v. Genesco, Inc.*,
742 F.2d 1401 (Fed. Cir. 1984) ............................................................................. 14

*Lindy Pen Co. v. Bic Pen Corp.*,
725 F.2d 1240 (9th Cir. 1984) ............................................................................. 17

*M2 Software, Inc. v. Madacy Ent.*,
421 F.3d 1073 (9th Cir. 2005) ............................................................................. 14

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
290 F. Supp. 2d 1083 (C.D. Cal. 2003) ............................................................ 18, 21, 22, 25

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ....................................................................................... 6

*Merriam-Webster, Inc. v. Random House, Inc.*,
35 F.3d 65, 72 (2d Cir. 1994) ............................................................................. 19

*Mirina Corp. v. Marina Biotech*,
770 F. Supp. 2d 1153 (W.D. Wash. 2011) ............................................................... 24

*Miss World (UK) Ltd. v. Mrs. Am. Pageants*,
856 F.2d 1445 (9th Cir. 1988) ............................................................................. 15

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
331 F. Supp. 2d 1214 (C.D. Cal.), *aff'd*, 114 F. App'x 921 (9th Cir. 2004) .......................... 21, 22

*Nautilus Grp. v. Savvier, Inc.*,
427 F. Supp. 2d 990 (W.D. Wash. 2006) ................................................................. 17

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) ............................................................................. 15, 16

*Network Automation, Inc. v. Hewlett-Packard Co.*,
No. CV 08-4675-JFW, 2009 WL 5908719 (C.D. Cal. Sept. 14, 2009) .................................. 8, 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Nora Beverages, Inc. v. Perrier Grp. of Am.*,
269 F.3d 114 (2d Cir. 2001)..................................................................................... 18

*Nutri/Sys., Inc. v. Con-Stan Indus.*,
809 F.2d 601 (9th Cir. 1987).............................................................................. 16, 19

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*,
578 F.3d 1154 (9th Cir. 2009).............................................................................. 15, 20

*Or. Arms, Inc. v. Or. Arms Ltd.*,
246 F.3d 675 (9th Cir. 2000) (unpublished) .......................................................... 18

*PlayMakers LLC v. ESPN, Inc.*,
376 F.3d 894 (9th Cir. 2004)....................................................................... 15, 21, 22, 23

*Quia Corp. v. Mattel, Inc.*,
No. C 10-1902 JFHRL, 2010 WL 2486364 (N.D. Cal. June 15, 2010). ................... 20

*Rain Corp. v. JYP Ent., Ltd.*,
No. 03:07-CV-00081-LRH-RAM, 2007 WL 18137772 (D. Nev. June 21, 2007) .......... 23

*Rudolph Int'l, Inc. v. Realys, Inc.*,
482 F.3d 1195 (9th Cir. 2007)................................................................................... 8

*Russell Rd. Food & Beverage, LLC v. Spencer*,
No. 2:12-CV-01514–LRH-GWF, 2013 WL 321666 (D. Nev. Jan. 28, 2013)............. 23

*Sato & Co. v. Kodiak Fresh Produce LLC*,
334 F. Supp. 3d 1023 (D. Ariz. 2017)..................................................................... 24

*Seal Shield, LLC v. Otter Prods., LLC*,
No. 13-cv-2736-CAB (NLS), 2014 WL 11350295 (S.D. Cal., Nov. 4, 2014),
*aff'd*, 680 F. App'x 560 (9th Cir. 2017).......................................................... 10, 12, 13

*Skechers U.S.A., Inc. v. Vans, Inc.*,
No CV 07-01703 DSF, 2007 WL 4181677 (C.D. Cal. Nov. 20, 2007).................... 17, 20

*Surgicenters of Am., Inc. v. Med. Dental Surgeries Co.*,
601 F.2d 1011 (9th Cir. 1979)............................................................... 7, 8, 10, 12

*Talking Rain Beverage Co. v. S. Beach Beverage Co.*,
349 F.3d 601 (9th Cir. 2003)................................................................................... 7

*Threshold Enters. v. Pressed Juicery, Inc.*,
445 F. Supp. 3d 139 (N.D. Cal. 2020) .................................................................. 7, 9

**TABLE OF AUTHORITIES**
(continued)

<u>Page</u>

*Tie Tech, Inc. v. Kinedyne Corp.*,
296 F.3d 778 (9th Cir. 2002) ..................................................................................... 7

*Toyota Motor Sales v. Tabari*,
610 F.3d 1171 (9th Cir. 2010) ................................................................................. 16

*Turo Inc. v. City of Los Angeles*,
847 F. App'x 442 (9th Cir. 2021) ............................................................................ 24

*United States Patent & Trademark Office v. Booking.com, B.V.*,
140 S. Ct. 2298 (2020) ............................................................................................... 9

*Westward Coach Mfg. Co. v. Ford Motor Co.*,
388 F.2d 627 (7th Cir. 1968) ................................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................... 2, 6, 24

**Statutes**

15 U.S.C. § 1051(b) ....................................................................................................... 6

15 U.S.C. § 1064 ............................................................................................................ 9

15 U.S.C. § 1115(a) ....................................................................................................... 7

15 U.S.C.§ 1116(a) ...................................................................................................... 24

15 U.S.C. § 1127 ............................................................................................................ 6

Cal. Bus. and Prof. Code § 17200 ................................................................................. 7

**Other Authorities**

Fed. R. Evid. 301 ......................................................................................................... 24

J. Thomas McCarthy, Trademarks & Unfair Competition (5th ed. 2020) .............. *passim*

**INTRODUCTION**

Plaintiffs' goal—to monopolize the word "cruise" for driving technology—is antithetical to the interests of competition and consumers. Fortunately, Plaintiffs' effort to chill use of a common English word must fail because they cannot show that they are likely to succeed. The terms "cruise" and "super cruise" are not protectable trademarks and confusion is unlikely.

For driving consumers, "cruise" is generic for driver assist systems. It has long been used by the automotive industry for driving technologies that make the driving task easier, faster, safer, more efficient, and eco-friendly. It matters not that GM's system adds other bells and whistles around "adaptive cruise" to permit hands-free driving. GM's own patents repeatedly use "cruise" generically, referring to a "semi-autonomous driving system, e.g., a super cruise system," and "super cruising." "Super Cruise" is at best a laudatory term layered on a generic one; it may or may not be "super" cruise technology, but it is unprotectable as a mark.

"Cruise" similarly is generic, or at best highly descriptive, for what cars do; no imagination is required by driving consumers when reading Plaintiffs' press releases about "Self-driving Chevy Bolts … *cruising* the streets of San Francisco," or their plan "for multiple autonomous vehicles to *cruise* around the track." Expert linguist testimony confirms that consumers, the industry, and media long have used "cruise" as a generic term. A survey using "the most used and judicially accepted format to test" genericness confirms that the primary significance of "cruise" is as a generic term—98% of respondents identified it as generic, and only 2% as a brand.

Even if "cruise" is descriptive, and not generic, the marks are not protectable unless Plaintiffs prove that consumers exclusively associate "cruise" with them. Plaintiffs' motion is bereft of such evidence. They eschew offering any consumer survey, which the Ninth Circuit describes as "the most persuasive evidence of secondary meaning." The most likely reason for Plaintiffs' lack of evidence is that a well-conducted survey, which Ford commissioned here, confirms *zero* consumer association of "cruise" with Plaintiffs.

Because consumers do not see "cruise" as source-identifying, they are not likely to be confused simply by Ford's use of that generic word in BlueCruise. A consumer survey testing for forward confusion using the "gold standard" methodology reveals *zero* percent net confusion. That

outcome is unsurprising—a weak mark is easily distinguished by consumers making an expensive, "high involvement" purchase. Responding last year to a party challenging *the same Super Cruise mark at issue here*, GM represented that the "degree of care exercised" by consumers and the "lengthy sales process" for vehicles, leaves "no room for misunderstanding regarding the sources of the respective products," which would justify a heightened "discriminating purchaser" standard. Viewing the parties' marks, as this Court must, as they appear in the marketplace—with the Ford name and other Ford indicia always appearing with BlueCruise, with Cadillac or other GM indicia always appearing with Super Cruise, and with "cruise" being used in lowercase on bright orange "cruise" robotaxis—consumer confusion is highly unlikely.

Plaintiffs fare no better on reverse confusion, as their speculation about what "might" occur is overwhelmed by Ford's empirical survey evidence showing *zero* reverse confusion. The absence of confusion is no surprise. Reverse confusion is inapplicable to situations involving a conceptually a weak senior mark because consumers do not singularly associate it with one source. Moreover, Ford's BlueCruise driving feature and a "cruise" robotaxi are very different concepts. Notwithstanding Plaintiffs' resources—that make it highly unlikely they ever could be swamped by another's ads—they once again adduce no survey evidence of confusion.

Plaintiffs fail to make "a clear showing" on the *Winter* factors required to support the "extraordinary and drastic remedy" of an injunction. Plaintiffs not only have no likelihood of success on the merits, but the harm an injunction would cause Ford and third parties far outweighs Plaintiffs' remote and speculative concerns. Plaintiffs' efforts should be seen for what they are: an attempt to block a competitor from using a highly apt word for driving safety technology, which is manifestly contrary to the public interest.

## STATEMENT OF FACTS[1]

### I.      "Cruise" Long Has Been A Standard Term Understood by Driving Consumers

Cruise control has been around for decades as a standard feature, and companies long have used the term "cruise" to communicate about driving systems to consumers. For example, vehicles featured "cruise" on the button/switch activating cruise functionality (Chollet ¶¶ 2-3):

---

[1] Declarations are cited by the last name of the declarant (*e.g.*, Chollet ¶ _, Poret ¶ _, etc.).



As technology evolved, "adaptive cruise"—not just one speed, but capable of recognizing vehicles and maintaining distance control (by decelerating and accelerating)—became commonplace. Most new cars today have adaptive cruise, and consumers and manufacturers use that term extensively to refer to the technology. Longarzo ¶¶ 2-6; Chollet ¶¶ 7-9; Joachimsthaler ¶¶ 15-17, 20, 24.

Because of this ubiquitous use of "cruise" by drivers and automakers over the past 50 years, consumers understand "cruise" to refer to a feature in their vehicle that performs part of the driving task or assists them in driving, and they do not associate that term with any one company or brand. *See* Finegan ¶¶ 13, 49 (linguist testimony); *see also* Poret ¶ 5 (survey showing no secondary meaning); Neal ¶¶ 2.2-2.3, 5.1 (Teflon survey demonstrating "cruise' is generic).

## II.   Ford and Ford's BlueCruise Technology

The Ford name and brand indicia are "extremely strong." Joachimsthaler ¶¶ 62-65, 88, 98, 178(b). For over a century, Ford has prominently featured blue, including in its well-known logo:



*Id.* ¶ 72; Longarzo ¶¶ 13-16. Ford is not like other automakers that may use blue at times. Referred to as "the Blue Oval" by consumers and the media, Ford owns federal registrations incorporating the Blue Oval, and Ford's materials have integrated the blue oval for decades. Retailers, like Home Depot, sell "Ford Blue" paint. *Id.* ¶¶ 16-20; Joachimsthaler ¶¶ 70-87, 178(b).

Ford introduced adaptive cruise more than a decade ago. While the technology has evolved, Ford consistently has used the generic or descriptive term "cruise" to describe its cruise and adaptive cruise technology. Longarzo ¶¶ 1-6. For example, Plaintiffs ignore Ford's long use of "Eco Cruise" for a driving feature limiting acceleration to help conserve fuel. *Id.* ¶¶ 42-43.

Ford's BlueCruise, housed (now *and* in the future) within Ford Co-Pilot360,[2] offers hands-free driving capability on certain highways. In a vehicle with BlueCruise, the driver must activate the hands-free capability through a multi-step series of prompts within the Ford Co-Pilot360 cruise settings, including enabling adaptive cruise. When an enabled car is in an area where the system is available—called "Blue Zones"—the instrument panel lights up (blue). *Id.* ¶ 44. Ford provides consumers with copious Ford-branded BlueCruise training and operating information. *Id.* ¶ 49.

BlueCruise is available initially only on certain of Ford's iconic F-150 and Mustang vehicles, priced from $47,195—$54,285 with the appropriate packages (costing at least $1595, and up to $6000, for the BlueCruise features). *Id.* ¶¶ 50-53. BlueCruise also requires a software subscription, costing $600 for three years, which is updated "over-the-air." *Id.*

For its hands-free system, Ford wanted a name tying into its existing brand and communicating to consumers that the system was an evolution of cruise technology. *Id.* ¶¶ 39-41 Ford selected the "BlueCruise" so that the name would (i) tie into Ford's branding and this technology (*e.g.*, "Blue Zones"), and (ii) communicate that the feature, like all adaptive cruise systems, still requires the driver's active involvement and attention. *Id.* ¶¶ 39-40. Ford was successful on both counts. *See* Joachimsthaler ¶¶ 10(e), 96-98. Ford specifically wanted to avoid any name implying that drivers need not be fully engaged. Longarzo ¶ 41. BlueCruise is not, and will not be, used anywhere where the Ford name and branding do not appear. *Id.* ¶ 45.

### III.    GM and GM's Super Cruise Technology

GM's well-known brands include Chevrolet, Buick, GMC, and Cadillac. GM also long has featured cruise control, and used "cruise" in a non-trademark manner on its cars (Longarzo ¶ 69):



In 2017, GM introduced "Super Cruise" as an advanced driver assist option only on the

---

[2] Ford Co-Pilot360 is a suite of advanced driver-assist technologies, such as adaptive cruise (with stop-and-go lane centering) and automatic emergency braking. Promoted extensively, Ford Co-Pilot360 is well-known and associated closely with Ford. *Id.* ¶ 37.

2018 Cadillac CT6 (costing over $60,000); it expanded slowly to other Cadillac models. Super Cruise requires (i) a hardware package costing $2500; and (ii) an active and eligible Cadillac Connected Services plan, which must be purchased again after three years. Chollet. ¶¶ 32-34, 37.

GM describes Super Cruise, which only works on certain "compatible highways," as "a driver assistance feature that enhances Adaptive Cruise Control." *Id.* ¶ 35. In the 2021 Cadillac Escalade owner's manual, the heading "Cruise Control" has subheadings for Cruise Control, Adaptive Cruise Control, and Super Cruise. *Id.* ¶ 36. GM's Super Cruise is designed to operate only after the driver engages the cruise technology (*Id.* ¶ 38):

> In order to use Super Cruise, first press the Adaptive Cruise Control⸢ button on the steering wheel to turn on Adaptive Cruise Control. The Adaptive Cruise Control symbol will illuminate in white on the instrument cluster. If Adaptive Cruise Control is already set, the symbol will be green with a speed shown.

Consumers purchasing Super Cruise receive a plethora of Cadillac-branded information about setting up and operating the system. *Id.* ¶ 39; Longarzo ¶ 75.[3]

## IV.    Cruise and Its Autonomous Robotaxis

Cruise Automation, Inc. (CAI) was founded in 2013 with the goal of creating kits to retrofit any car to drive itself on highways. In 2015, CAI shifted to developing software for fully autonomous vehicles. Chollet ¶¶ 10-11. When GM purchased CAI in 2016 (and it became Cruise LLC, referred to here as "CLLC"), not a single product or service had been launched.

Five years hence, CLLC's commercial activity is limited to beta-testing a "driverless" service, or "robotaxi," delivering people or groceries in two cities—San Francisco and Phoenix. *Id.* ¶¶ 13, 79. The test vehicles display "cruise" (in lowercase, stylized white lettering) on the back door with orange branding. *Id.* ¶ 15. CLLC does not sell self-driving vehicles, and does not license or sell software for use in other companies' vehicles, under the "cruise" name. *Id.* ¶ 16.

*Before* acquiring CAI, *GM* filed an intent-to-use application for CRUISE for "computer software for the autonomous driving of motor vehicles." *Id.* ¶ 17. During the application process, and in an apparent effort to mislead the U.S. Patent & Trademark Office ("PTO") into believing

---

[3] Plaintiffs describe "protracted" discussions before their Complaint. They omit the earliest exchanges between in-house counsel (with information about how BlueCruise will and will not be used), and Ford counsel's response. *See* Chollet ¶¶ 40-41. They also omit that Plaintiffs dragged those fruitless discussions on for months, just long enough to announce—on the same day as filing the Complaint—that Super Cruise would someday be on additional GM vehicles. Longarzo ¶ 78.

1    (falsely) that *GM* had made bona fide use of the CRUISE mark *for software*, GM's Statement of

2    Use (SOU) submitted screenshots of *CLLC's* account on "Github," a third-party development site.

3    After the PTO rejected this specimen, GM submitted another screenshot describing *CLLC's*

4    "webviz" software (an open source development tool to visualize software and data), and convinced

5    the PTO to register the mark. Webviz may be a tool for developing software, but neither GM nor

6    CLLC offered any autonomous driving software in commerce prior to GM's SOU filing. After the

7    registration issued, GM recorded an assignment to another entity, GM Cruise Holdings LLC ("GM

8    Cruise"), which purportedly was effective on the date the SOU was accepted.[4]

9                                         **ARGUMENT**

10           A preliminary injunction is "an extraordinary and drastic remedy, one that should not be

11   granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.*

12   *Armstrong*, 520 U.S. 968, 972 (1997) ("[T]he requirement for substantial proof is much higher").

13   Whether the test is the four *Winter* factors, or an alternative "sliding scale," "a preliminary

14   injunction is an 'extraordinary remedy that may only be awarded upon a clear showing that the

15   plaintiff is entitled to such relief.'" *Freelancer Int'l Pty Ltd. v. Upwork Glob., Inc.*, No. 20-cv-

16   06132-SI, 2020 WL 6271030, at \*4 (N.D. Cal. Oct. 23, 2020) (quoting *Winter v. Nat. Res. Def.*

17   *Council, Inc.*, 555 U.S. 7, 22 (2008)), *aff'd*, 851 F. App'x 409 (9th Cir. 2021).

18   **I.       Plaintiffs are Not Likely to Succeed on the Merits**

19           "To prove trademark infringement, plaintiffs must show (1) priority use of a valid,

20   protectable trademark; and (2) that defendants' use of the mark is likely to cause confusion."

21   *Freelancer,* 2020 WL 6271030, at \*5; *accord Dep't of Parks & Recreation for State of Cal. v.*

22   *Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (affirming denial of preliminary

23

24   _____

25   [4] Chollet ¶¶ 17-20. On these facts, the CRUISE registration is void (for reasons *in addition to* being generic and/or descriptive without secondary meaning, which are described below). To obtain the registration, GM submitted a declaration that the mark was in use, but the "Webviz"

26   software submitted was for CLLC's *internal* use (and only shared publicly "as a general robotics data inspection tool . . . that any robotics developer" could use, rather than as the applied for

27   software goods), which is not trademark use sufficient to support its statement of use. *See* 15 U.S.C. § 1127; Chollet ¶ 20. Moreover, it is curious that GM (not yet-to-be-acquired CLLC) filed

28   the application for "computer software for the autonomous driving of motor vehicles," likely without the required "bona fide intention" to use the mark. 15 U.S.C. § 1051(b).

injunction).[5] It is an empirical question whether Ford's use of "BlueCruise" for optional adaptive cruise technology—sold only by Ford (through a Ford-branded network and using a system that requires the Ford Co-Pilot360 technology) to owners of specific Ford-branded vehicles (having optional hardware packages and software subscription), who exercise tremendous care in such "high involvement" buying decisions—is likely to cause confusion. Multiple surveys provide empirical evidence of *zero* likely confusion.

Overwhelming evidence, including consumer surveys and linguistic testimony, confirms that Plaintiffs do not have a protectable interest in "cruise" or "super cruise" because they are generic, or merely descriptive and without secondary meaning, for Plaintiffs' goods. The CRUISE registration also suffers from other fatal defects.[6] Although registration provides "prima facie evidence" of a mark's validity, 15 U.S.C. § 1115(a), and a "presumption" that it is protectable,[7] nothing supports Plaintiffs' circular claim that a registration, *ipse dixit*, obviates the need to prove a protectable mark.  Evidence of invalidity causes the presumption to burst like a bubble. *Talking Rain Beverage Co. v. S. Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003). In summary,

> Validity, then, is a threshold issue. On this point, the plaintiff in an infringement action with a registered mark is given the prima facie or presumptive advantage on the issue of validity, thus shifting the burden of *production* to the defendant to prove otherwise …. Once the presumption of validity is overcome, however, the mark's registration is merely evidence "of registration," nothing more. This approach can be characterized as rebutting the prima facie case or "piercing the presumption."

*Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) (emphasis added).[8]

---

[5] The elements of state common law and statutory claims, including § 17200, are "substantially congruent" to those of Lanham Act claims. *Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir. 1996).

[6] Ford has filed petitions to cancel both the CRUISE and SUPER CRUISE registrations with the PTO's Trademark Trial and Appeal Board. *See* Chollet ¶¶ 43-45.

[7] Applied to this case, when a registration issues without a requirement to prove secondary meaning, the presumption is that the mark is inherently distinctive. The corollary, however, is the *absence* of any presumption of secondary meaning unless the PTO required proof of it as part of the process, which it did not for Plaintiffs' applications.

[8] Nothing prevents a registered mark from being found generic, *e.g.*, *Surgicenters of Am., Inc. v. Med. Dental Surgeries Co.*, 601 F.2d 1011, 1020 (9th Cir. 1979); indeed, such an outcome can hold even at the pleadings stage. *See, e.g., Threshold Enters. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 154-55 (N.D. Cal. 2020) (finding claimed marks generic on motion for judgment on the pleadings despite "strong presumption of validity" attaching to incontestable registrations).

### A.      Plaintiffs' Putative Cruise Marks Are Generic and Not Protectable

"A generic term … refers to the type or species of the product at issue. Generic terms cannot be protected trademarks." *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1197 (9th Cir. 2007); *see Closed Loop Mktg., Inc. v. Closed Loop Mktg., LLC*, 589 F. Supp. 2d 1211, 1220 (E.D. Cal. 2008) (a generic word "is ineligible for protection regardless of any evidence of secondary meaning."). In this Circuit,

> The question of genericness is often answered by reference to the "who-are-you/what-are-you" test: a valid trademark answers the former question, whereas a generic product name or adjective answers the latter. If the primary significance of the trademark is to describe the type of product rather than the producer, the trademark is a generic term and cannot be a valid trademark.

*Randolph*, 482 F.3d at 1198 ("Adjectives, as well as nouns, can be generic"); *accord Surgicenters*, 601 F.2d at 1020 ("surgicenter" generic for medical services); *Network Automation, Inc. v. Hewlett-Packard Co.*, No. CV 08-4675-JFW (RZx), 2009 WL 5908719, at *4-5 (C.D. Cal. Sept. 14, 2009) ("network automation" generic for software).

When used for driver assist technology, "cruise" unquestionably "relates to the type of product rather than its source and consequently falls on the 'what-are-you' side of the genericness test." *Rudolph*, 482 F.3d at 1198-99; *see* Finegan ¶¶ 13, 28, 31, 49. Manufacturers may choose to use a proprietary name—"pilot," "assist(ance)," or "sens(e/ing)"—but consumers shopping for hands-free driving understand that cars with that capability have "cruise." *See Advertise.com, Inc. v. AOL Advert., Inc.*, 616 F.3d 974 (9th Cir. 2010) (reversing grant of preliminary injunction). Old-fashioned "cruise control" may refer to "a single, constant speed," but the definition of "cruise" is not so crabbed; it includes "to move or proceed speedily, smoothly, or effortlessly" and "to travel along at a moderately fast, easily controllable speed." Finegan ¶¶ 13, 15-20, 26-28; *see id.* ¶ 13(a)(ii) ("including its extended meanings for more modern driver-assist systems").

GM's own generic use of "super cruise control," is "strong evidence" of genericness. *Network Automation*, 2009 WL 5908719, at *5. GM's materials refer to "super cruise control." Chollet ¶ 31; Joachimsthaler ¶ 115. In addition, GM patents and patent applications make rampant generic use of "cruise." For example, according to one GM patent,

in addition to controlling speed and/or position of the vehicle relative to other vehicles, *the cruise control system may control steering wheel position of the vehicle, or otherwise guide the vehicle by directing the vehicle* while the cruise control system is activated. The cruise control system may therefore be *a super cruise system*, where the vehicle generally guides the vehicle on a road such that a driver can cruise at a desired speed or range of speeds, and need not manually steer the vehicle to maintain the vehicle in a desired lane and/or avoid other vehicles.

Chollet ¶ 26 (emphasis added); *id.* ¶¶ 25-29 ("wherein the semi-autonomous driving system is a super cruise system," "which road(s) are eligible for super cruising," "where super cruising functions may be unsafe"); Finegan ¶¶ 45.

The media, competitors, and the trade all refer to "cruise" (or adaptive cruise, etc.) as the type of product. *See* Finegan ¶¶ 31-35, 40-44; Chollet ¶¶ 9, 30, 80-85. "How media outlets use a term is helpful in genericness analysis because the media often has its finger on the pulse of the general public." *Threshold*, 445 F. Supp. 3d at 152. Thus, "federal courts view usage of a particular term in the popular press as strong evidence of how the public perceives that term." *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1189 (C.D. Cal. 2007).[9]

Competitors' use also is "strong evidence," *Id.* at 1190, so industry uses are "particularly helpful." *Id.* at 1192; *accord CG Roxane LLC v. Fiji Water Co.*, 569 F. Supp. 2d 1019, 1027 (N.D. Cal. 2008) ("Bottled at the source" held generic); *see Closed Loop*, 589 F. Supp. 2d at 1219 (finding genericness as a matter of law based in part on six third-party uses). The meaning of cruise in the context of driver assist systems (and software) has been reinforced for many years by the auto industry, including with "cruise" buttons, adaptive cruise, and more. *See* Chollet ¶¶ 3, 8-9.

Dr. Edward Finegan, Professor Emeritus of Linguistics and Law at USC, analyzed the meaning of "cruise" to identify its "primary significance" in connection with Plaintiffs' goods and services. 15 U.S.C. § 1064 (test is "primary significance"; generic mark registration can be cancelled "[a]t any time."). Using well-accepted linguistic techniques, Dr. Finegan reviewed dictionaries, corpora (word databases), and other usage (including by Plaintiffs), and categorized those materials. Based on that review, Dr. Finegan's expert opinion is that "cruise" is generic for

_____

[9] Identifying consumer perception as key, the Court in *United States Patent & Trademark Office v. Booking.com, B.V.*, 140 S. Ct. 2298, 2307 n.6 (2020), noted that "[e]vidence informing that inquiry can include not only consumer surveys, but also dictionaries, usage by consumers and competitors, and any other source of evidence bearing on how consumers perceive a term's meaning."

driver-assist systems, including their underlying technology (e.g., hardware, software, etc.). *See* Finegan ¶¶ 13, 49; *see also id.* ¶ 28, 30, 31, 49.

Consumer surveys are "almost de rigueur in litigation over genericness," yet Plaintiffs offer none. J. Thomas McCarthy, Trademarks & Unfair Competition ("McCarthy") § 12:14 (5th ed. 2020). In contrast, Dr. David Neal tested whether "cruise" is generic using a "Teflon survey," which "has proven to be the most used and judicially accepted format to test a genericness challenge." *Id.* "A 'Teflon Survey' is essentially a mini-course in the generic versus trademark distinction, followed by a test." *Id.* § 12:16. Dr. Neal's survey confirms that the primary significance of "cruise" is as a generic term. Neal ¶ 2.2 (98% generic; 2% brand). That survey deserves "substantial weight." *Intel Corp. v. Advanced Micro Devices, Inc.*, 756 F. Supp. 1292, 1297 (N.D. Cal. 1991); *accord Elliott v. Google, Inc.*, 860 F.3d 1151, 1160 (9th Cir. 2017); *Home Decor Ctr., Inc. v. Google, Inc.*, No. CV 12-5706-GW(SHx), 2013 WL 10858861, at *5 (C.D. Cal. May 9, 2013) (citing Teflon survey from Dr. Wind to find "Home Decor Center" generic).

**B.      Plaintiffs' Marks Are At Best Descriptive and Lack Secondary Meaning and, Therefore, Are Not Protectable.**

**1.      "Cruise" and "Super Cruise" Are At Best Merely Descriptive**

A "merely descriptive" term "describes a characteristic or ingredient of an article or service." *Surgicenters*, 601 F.2d at 1014. "Cruise" and "Super Cruise" are not protectable because "cruise" is, at most, merely descriptive for driver assist systems, including underlying software and related services. The "primary criteria" for distinguishing suggestive and descriptive marks is

> the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product. A mark is suggestive if "imagination" or a "mental leap" is required in order to reach a conclusion as to the nature of the product being referenced. By contrast, a mark is descriptive if it defines a particular characteristic of the product in a way that does not require any exercise of the imagination.

*Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1198, 1201 (9th Cir. 2009); *accord Seal Shield, LLC v. Otter Prods., LLC*, No. 13-cv-2736-CAB (NLS), 2014 WL 11350295 (S.D. Cal., Nov. 4, 2014) ("Life Proof" merely descriptive as a matter of law for a protective case for an electronic device), *aff'd*, 680 F. App'x 560 (9th Cir. 2017). A second test—the "competitors' needs test"—"focuses on the extent to which competitors would need to use the mark to identify their goods." *Id.* at *8.

"Context is critical to a distinctiveness analysis. Whether a mark is suggestive or descriptive can be determined only by reference to the goods or services that it identifies. … The mark must be evaluated as if it were seen on the goods or services, which means that mark must be examined in the industry context rather than in the abstract." *Lahoti*, 586 F.3d at 1201; *see Closed Loop*, 589 F. Supp. 2d at 1218 (test is "thought process [of] the consuming, rather than general, public"). A term is unequivocally descriptive even if it describes only one part of the product. "[A] mark need not recite each feature of the relevant goods or services to be descriptive." *Lahoti*, 586 F.3d at 1201; *see Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir. 1970). Framed otherwise, "[e]ven if a word describes only a single characteristic or property of a product, it can still be a descriptive mark." *CG Roxane*, 569 F. Supp. 2d at 1030; *accord Japan Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F.3d 866, 872 (9th Cir. 2002) (term is descriptive if it describes "an attribute of a product"); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).

Both "cruise" and "super cruise"[10] are at best descriptive under the "imagination test." In addition to linguistic and survey evidence, the Court need not look further than GM's own description of "super cruise" technology as "a driver assistance feature that *enhances Adaptive Cruise Control*…. The system works with Adaptive Cruise Control – Advanced...." Chollet ¶ 35.

"Cruise" and "Super Cruise" also are at best highly descriptive for a driving system that allows vehicles to "cruise" hands free. *See* Finnegan ¶¶ 35-37, 46, 48-49. The public readily understands—with no imagination—articles describing "Self-driving Chevy Bolts are *cruising* the streets of San Francisco," "The regulatory approval … allow[ing] Waymo's driverless cars to *cruise* through California at speeds up to 65 miles per hour," or "Imagine if instead of paying for downtown parking, you could just have your car *cruise* the streets by itself while you attended to your business." Chollet ¶¶ 4-6.

Indeed, "cruise" is by no means exclusive to Plaintiffs; competitors, the public, and the press use it extensively. Numerous third parties have registered and/or used "cruise" marks for similar technology. More than 800 federal registrations contain the formative "cruise," including

---

[10] "Super" is a laudatory term incapable of providing inherent distinctiveness to an already descriptive mark. *See* McCarthy § 11:28; Finegan ¶ 41.

111 in classes covering [software] and vehicles. *Active* registrations[11] include:

- AUTOCRUISE (stylized) (Reg. No. 3,559, 686) for "electronic cruise control apparatus" and driver assistance systems for vehicles, namely radar-based adaptive cruise controls …;

- SMARTCRUISE (Reg. No. 1,972,159) for "proximity systems comprising electronic proximity sensor and speed control …";

- GLOBAL CRUISE (Reg. No. 2,910,682) for "electronic vehicle speed controls"; and

- CM CRUISE-MATE MOTORCYCLE CRUISE ASSIST (Reg. No. 4,579,235) for "cruise controls for motorcycles."

These marks all are in use; others are in use but not registered. Chollet ¶¶ 46-65. For example, Mack offers Predictive Cruise, combines "GPS and the Mack® *m*DRIVE™ transmission with a *cruise control system* that learns on the go." *Id.* ¶ 66. This broad use of a common term establishes that "cruise" is at best merely descriptive. *See, e.g., Entrepreneur*, 279 F.3d at 1143 (six titles and five registrations, as well as domain names and "frequent use of the word 'entrepreneur' as a common noun," indicate widespread use and weakness); *see also* Finegan ¶¶ 31-39, 46-48

### 2. Plaintiffs' Putative Cruise Marks Lack Secondary Meaning

If "cruise" is merely descriptive and is not generic, Plaintiffs must prove that their asserted marks have acquired secondary meaning. Without such proof, they are "not entitled to protection." *Surgicenters*, 601 F.2d at 1018; *see also* McCarthy § 11:2 ("Without achieving distinctiveness … a designation does not have the legal status of a 'trademark' or 'service mark.' No distinctiveness—no mark."). "When descriptive marks are especially 'weak,' [the Ninth Circuit] require[s] a 'strong showing of strong secondary meaning." *Japan Telecom*, 287 F.3d at 873.

"The basic element of secondary meaning is … the mental association by a substantial segment of consumers and potential consumers 'between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (quoting *McCarthy* § 15:2); *accord Seal Shield*, 2014 WL 11350295, at *9 (plaintiff must demonstrate "mental association by a *substantial* segment of consumers and potential consumers").

---

[11] The PTO has approved a statement of use for an application, not opposed by Plaintiffs, so another registration will issue shortly for IQ-CRUISE for "advanced driver assistance systems for vehicles, namely, … computer software and related hardware therewith for advanced driver assistance vehicles" and "software for the semi-autonomous driving of vehicles." *Id.* ¶ 52.

"Several factors aid the factfinder in determining whether a mark has acquired secondary meaning: '(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed mark, (3) the length and manner of use of the claimed mark, and (4) whether use of the claimed trademark has been exclusive.'" *Id.* at *9 (quoting *Japan Telecom*, 287 F.3d at 873); s*ee also Levi Strauss*, 778 F.2d at 1358; Joachimsthaler ¶¶ 10(d), 105-08, 110-15, 178(d).

Purchaser Association. "Although consumer-survey type evidence is not required for [Plaintiff] to prevail on its claims, in its absence we are unable to 'say with confidence precisely what consumers will understand the mark to mean.'" *Seal Shield*, 680 F. App'x at 562; *see Levi Strauss*, 778 F.2d at 1358 ("An expert survey of purchasers can provide the most persuasive evidence on secondary meaning."); *Network Automation*, 2009 WL 5908719, at *4-7 (noting lack survey from plaintiff).

Plaintiffs proffer no survey despite knowing, before filing the Complaint, that Ford had a survey showing the absence of secondary meaning. A leading survey expert, Hal Poret, tested whether relevant consumers associate the word "cruise" with a single source. Poret ¶ 3. Three test groups were shown "Cruise" in the context of (i) a self-driving (driverless) ride service; (ii) a hands-free driving feature; and (iii) automated driver-assist features. Respondents were asked if they have ever seen or heard of the term in connection with the relevant service/feature, and whether they associate it with any specific company or companies (and, if yes, what entity). *Id*. ¶ 4. The control groups took the identical survey but "Guide" replaced "Cruise." For the test groups, only 4%, 4%, and 0.7%, respectively. had seen or heard of "Cruise," and associated it with one company. Deducting the corresponding controls, the Poret Survey showed *zero* secondary meaning for "cruise" for the relevant services. *Id.* ¶ 5.

This unrebutted survey evidence is dispositive at any stage, and fatal to this motion where Plaintiffs bear a much higher burden. *See* McCarthy § 32:190; *accord Excelligence Learning Corp. v. Oriental Trading Co.*, No. C 03-4947 JF, 2004 WL 2944048, at *10 (N.D. Cal. Dec. 20, 2004) ("In the face of the [survey evidence], which establishes that customers do not associate the catalog's trade dress with its source, the fact that [plaintiff] is an industry lead with a high volume

of sales simply is insufficient to create a triable issue of material fact as to secondary meaning.").

Degree and Manner of Advertising. Plaintiffs claim to have spent "millions" on advertising, but provide no substantiation (as to the amount, type, timing, or otherwise). *See* Joachimsthaler ¶¶ 106-08, 111-18; Longarzo ¶¶ 75-76, 80-85. Moreover, "[a]lthough courts look to advertising and sales as evidence of secondary meaning, this evidence is not conclusive. Naturally, a 'large expenditure of money does not in itself create legally protectable rights.'" *CG Roxane*, 569 F. Supp. 2d at 1031 (quoting *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970)). In other words, effort is not enough: "[t]he test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question," *Dep't of Parks & Recreation*, 448 F.3d at 1127, and Plaintiffs offer no evidence on consumer perception.

Length and Manner of Use, and Exclusivity. GM has used Super Cruise only for a few years on a few car models, and at no time have Plaintiffs enjoyed substantially exclusive use. Longarzo ¶ 73. The short length and narrow manner of use, and (lack of) exclusivity, weigh against Plaintiffs. "When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term . . . distinctiveness on which purchasers may rely is lacking …." *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed. Cir. 1984). "Other circuits have explicitly held that extensive use alone cannot establish secondary meaning. Our own cases have suggested that secondary meaning requires more than extensive use alone." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009). Plaintiffs' vague suggestion of *circumstantial* evidence of secondary meaning (by virtue of sales, some ads, etc.) is woefully insufficient in light of Ford's *direct* evidence showing a complete lack of secondary meaning.

## C.    Plaintiffs Cannot Prove Likely Confusion

Plaintiffs cannot prove that it is "'probable,' not merely 'possible,'" that Ford's BlueCruise option is "likely to confuse *an appreciable number* of people." *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005); *accord Cohn v. Petsmart, Inc.*, 281 F. 3d 837, 842 (9th Cir. 2002) ("probable, not simply a possibility").[12] Plaintiffs' papers erroneously focus solely on

---

[12] Plaintiffs assert both forward and reverse confusion. For the former, Plaintiffs must show

1   Ford's use of the term "cruise." Likelihood of confusion only can be judged by viewing the

2   respective parties' marks *as a whole*, and as they "are encountered in the marketplace." *Network*

3   *Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011); *accord*

4   *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1163 (9th Cir. 2009); *Miss World*

5   *(UK) Ltd. v. Mrs. Am. Pageants*, 856 F.2d 1445, 1450 (9th Cir. 1988) (mark "must be examined in

6   its entirety, not piece by piece."). In addition to always being used as BlueCruise (a single word),

7   consumers simultaneously encounter the FORD name (and famous nameplates and indicia), just as

8   GM's customers encounter the CADILLAC nameplate and other indicia. Longarzo ¶¶ 36, 48, 74.

9       The *Sleekcraft* factors "are intended as an adaptable proxy for consumer confusion, not a

10  rote checklist." *Network Automation*, 638 F.3d at 1145 (reversing grant of preliminary injunction);

11  *see One Indus*, 578 F.3d at 1162 (affirming grant of defense summary judgment motion, noting

12  that "applying the *Sleekcraft* test is not like counting beans"). Based on high levels of consumer

13  care, the weakness of Plaintiffs' marks, and differences between the marks as they actually appear

14  in the marketplace, as well as surveys demonstrating zero likely confusion, Plaintiffs cannot

15  clearly show that likely confusion is probable, which by itself defeats their peremptory relief.

16              **1.    Purchasers Exercise A High Degree of Care**

17      This Circuit posits the "reasonably prudent consumer in the marketplace" to assess

18  likelihood of confusion. *Dreamwerks Prods. Grp. v. SKG Studio*, 142 F. 3d 1127, 1129 (9th Cir.

19  1998). "When services are expensive and the purchasers are knowledgeable and sophisticated, a

20  greater degree of care can be expected from the buyer .…" *EA Eng'g Sci. & Tech, Inc. v. Environ.*

21  *Audit, Inc.*, 703 F. Supp. 853, 858 (C.D. Cal. 1989).

22      As explained by Dr. Erich Joachimsthaler, a branding and marketing expert, vehicles and

23  their various technology options are textbook examples of "high-involvement" shopping,

24  including a high degree of care, consumer research and consideration of options, and an extended

25  time for consideration. *See* Joachimsthaler ¶¶ 10(c), 120, 135-37, 144-48, 154, 178(c); *see also*

26  Longarzo ¶¶ 11, 54-55. Courts recognize that "[a]n automobile is a major purchase, and one in

27

28  potential purchasers of Ford's vehicles are likely to be confused. For the latter, Plaintiffs must
    show likely confusion among potential purchasers of their products. *See PlayMakers LLC v.*
    *ESPN, Inc.*, 376 F.3d 894, 897 (9th Cir. 2004).

1  which a reasonably prudent purchaser would invest a great deal of care and attention, rendering

2  confusion less likely." *FW OmniMedia Corp. v. Toyota Motor Sales, U.S.A., In*c., No. 04CV–8624

3  GPS (JRx), 2004 WL 3203134, at *8 (C.D. Cal. Dec. 8, 2004); *accord Toyota Motor Sales v.*

4  *Tabari*, 610 F.3d 1171, 1178 (9th Cir. 2010) (consumers using autobroker with Lexus in domain

5  not likely to be confused because "consumers who use the internet for shopping are generally

6  quite sophisticated about such matters"). Plaintiffs argue that consumers are cautious about semi-

7  and fully-autonomous vehicles, which implies a high degree of care. *See* Joachimsthaler ¶ 33.

8       GM is in no position to contend otherwise. In 2020, in response to a third party's petition

9  to cancel GM's SUPER CRUISE registration, GM represented to the Trademark Trial and Appeal

10  Board that the nature of GM's goods—*the same goods at issue here*—warrant an elevated

11  "discriminating purchaser" standard, including because of the "degree of care exercised," and

12  "lengthy sales process, leaving no room for misunderstanding regarding the sources of the

13  respective products." *See* Chollet ¶ 69; *see also* McCarthy § 23:96 ("discriminating purchaser"

14  standard). This factor weighs heavily in Ford's favor, and influences the other factors as well.

15            **2.    Plaintiffs' Marks Are Weak And Entitled To Little, If Any, Protection**

16       The word "cruise" is a weak mark; both "Super Cruise" and "Cruise" are weak under the

17  "relevant measurements"—conceptual strength and commercial strength. *Network Automation*,

18  638 F.3d at 1149.[13] "Cruise" certainly is conceptually weak. "A 'weak' mark is a mark that is a

19  meaningful word in common usage or is merely a suggestive or descriptive trademark." *Alpha*

20  *Indus. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445 (9th Cir. 1980); *accord Nutri/Sys.,*

21  *Inc. v. Con-Stan Indus.*, 809 F.2d 601, 605 (9th Cir. 1987) ("Arbitrary or fanciful marks (*i.e.*,

22  Kodak) are called 'strong,' whereas descriptive or suggestive marks are 'weak.'"), "Cruise" is an

23  oft-used "meaningful word in common usage," and is weak by virtue of being generic or at best

24

_____

25  [13] Plaintiffs make passing reference to a "family" of marks, but that doctrine is unavailable to them.
    Plaintiffs cannot "squint at the possibility of acquiring rights in a 'family of marks' … under

26  circumstances even remotely resembling those of this case." *Creamette Co. v. Merlino*, 299 F.2d 55,
    59 (9th Cir. 1962). Some referenced marks are not even in use. Chollet ¶¶ 74-76. The "cruise"

27  marks in use are "unprotectable or at least 'weak,'" and cannot be a family. McCarthy § 23:61. To
    the contrary, CLLC apparently despairs at even the remote possibility of being associated with a

28  source of "low" level two technology, but Super Cruise is exactly that. *See* Chollet ¶ 86.

highly descriptive. *See* Finegan ¶¶ 13, 49; Neal ¶¶ 2.2-2.3-5.1; Joachimsthaler ¶¶ 100-08.

As outlined above in the secondary meaning section, Plaintiffs' marks are commercially weak, which is empirically confirmed by the absence of any association between them and "cruise." Poret ¶ 5. In addition, the third-party use outlined above also weighs heavily against a finding of commercial strength. *See* McCarthy § 11:85 (discussing the "crowded market" test as an indicator as to the mark's commercial strength). As tangible proof of that fact, GM claims that it has used "Super Cruise" since 2012, and CAI started using "Cruise" for autonomous vehicles in 2013. For at least three years, GM and CAI were *entirely unrelated*, and *both using* marks with "cruise"—apparently without confusion or concern for the other's use. *See* Chollet ¶¶ 21-24.

### 3.  Ford's BlueCruise Name Is Readily Distinguishable From Super Cruise

"Similarity of the marks … must be considered as they are encountered in the marketplace." *Alpha.*, 616 F.2d at 444. "The comparison should be made in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods." *Id.* BlueCruise (one word) and Super Cruise are readily distinguishable; they look different, sound different, and have different connotations. *See Nautilus Grp. v. Savvier, Inc.*, 427 F. Supp. 2d 990, 994-99 (W.D. Wash. 2006) (confusion unlikely as a matter of law between BODYFLEX and BOWFLEX because "the two marks are dissimilar except for the common suffix 'flex.'").

Ford's BlueCruise name is a single word combining the Ford associated word "Blue" with the generic word "cruise"; it always in close proximity to Ford and its famous nameplates (like F-150 and Mustang), and other Ford indicia, which makes it dissimilar from GM's Super Cruise appearing only with Cadillac (or other well-known GM nameplates, like Chevrolet). *See* Longarzo ¶¶ 21-36, 47-48, 74-75; Joachimsthaler ¶¶ 63-65, 94, 168-69. In *Alpha*, the Ninth Circuit noted that one party used ALPHA alone "and in a distinctive logo," whereas the other used it "always in conjunction with another word or words …. These other words are significant words, indicating a different origin, not merely descriptive words." 616 F.2d at 444; *see also Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) (marks distinguished by company marks and logos); *Skechers U.S.A., Inc. v. Vans, Inc.*, No CV 07-01703 DSF (PLAx), 2007 WL 4181677, at *6 (C.D. Cal. Nov. 20, 2007) (brand on shoes and boxes makes it "unlikely that purchasers would be

confused"); *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1093

(C.D. Cal. 2003) (house mark TOYOTA "may reduce or eliminate likelihood of confusion.");

*Westward Coach Mfg. Co. v. Ford Motor Co*., 388 F.2d 627, 633 (7th Cir. 1968) ("Ford's

MUSTANG was plainly identified as a Ford product").

### 4.  No Evidence of Actual Confusion Exists, and Survey Evidence Establishes that Forward Confusion is Highly Unlikely

Plaintiffs contend it is too early for actual confusion, and do not identify any. Dr. Wind's

declaration includes a handful of tweets inquiring about the two companies, which he implies

signify confusion, but "inquiries are too ambiguous to demonstrate actual confusion." *Cohn*, 281

F.3d at 843 n.7; *accord Nora Beverages, Inc. v. Perrier Grp. of Am.*, 269 F.3d 114 (2d Cir. 2001)

("Inquiries about the relationship between an owner of a mark and an alleged infringer do not

amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion

between the products such as to inspire the inquiry itself."); see Joachimsthaler ¶¶ 151-53, 170-71.

Dr. Deborah Jay conducted a survey testing for confusion between Ford's BlueCruise and

Plaintiffs' "Cruise" marks. Jay ¶ 4. Her *Eveready* survey—the "gold standard" methodology[14]—

was designed to test "forward confusion," *i.e.*, whether prospective Ford consumers mistakenly

believe that Ford's goods are put out by, or affiliated with, or sponsored by, Plaintiffs.

Respondents viewed two videos about Ford's BlueCruise system and were asked the standard

*Eveready* questions. Only 2% "said General Motors was the source or sponsor of, or was affiliated

with, the advanced driver assistance system in the videos." With the name changed to

"BlueControl" (as a control to measure guessing, demand effects, and other noise), a similar 2%

were confused. *Id.* ¶ 5. Thus, the net confusion rate is *zero percent*—confirming that confusion not

only is unlikely but nonexistent. *Id.* ¶¶ 5-6*; see* McCarthy § 32.189.

Despite knowing, before filing the Complaint, that Ford had a survey evidence showing no

confusion, Plaintiffs fail to offer any themselves. Plaintiffs failure to provide "consumer surveys

demonstrating confusion" is evidence that confusion is unlikely. *Or. Arms, Inc. v. Or. Arms Ltd.*,

---

[14] *Allstate Ins. Co. v. Kia Motors Am., Inc.*, No. CV 16-06108 SJO (AGRx), 2017 WL 10311211, at *5 (C.D. Cal. Sept. 0, 2017) ("gold standard").

246 F.3d 675, at *2 (9th Cir. 2000) (unpublished) (citing *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) ("The lack of survey evidence counts against finding actual confusion.")); *see Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998) ("[A] plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable.").

### 5.  Ford and GM Use Similar Marketing Channels, but Entirely Different Distribution Channels

In *Nutri/System*, the Ninth Circuit affirmed a finding that "[a]lthough similarities exist between Nutri/System's and Nutri-Trim's services, … they differ significantly in the method of operation … and the facilities in which they offer their services. Therefore, the channels of trade do not converge, and there is little likelihood of confusion." 809 F.2d at 606.

Consumers cannot purchase Ford BlueCruise or Cadillac Super Cruise in the same store, much less the same aisle. BlueCruise technology is offered exclusively on Ford vehicles as part of the Ford Co-Pilot360 suite of drive assist technologies, *i.e.*, consumers must buy a Ford vehicle with a specific make and model, and with the appropriate hardware/software package, and then they receive BlueCruise only via subscription. Cadillac's Super Cruise is available on only certain makes/models, requires Cadillac Connected Services, and then a software subscription update. Both systems require training, and operate differently. *See* Joachimsthaler ¶ 145; Chollet ¶¶ 37-39.

### 6.  Ford Selected And Adopted its Mark In Good Faith

Plaintiffs wrongly imply that knowledge equates to intent. Bad faith only exists if "the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Kern v. Mindsource, Inc.*, 225 F.3d 663, at *3 (9th Cir. 2000); *see Nutri-Sys.*, 809 F.2d at 606; *Alpha*, 616 F.2d at 446. "[G]ood faith can be found if the defendant has selected a mark that reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *Kern*, 225 F.3d 663, at *4.

Ford has zero desire for BlueCruise to be associated with GM, and Ford never contemplated trading on GM's goodwill. Longarzo ¶ 46. Ford has used "cruise" for decades as the technology has evolved, *e.g.*, cruise control, cruise, adaptive cruise, etc. Ford has used "Eco

Cruise" since in 2012. *Id.* ¶¶ 42-43. Ford chose "BlueCruise" to leverage existing branding, and because "cruise" is the name of the product, describes its' characteristics, and is a well understood by consumers. *Id.* ¶¶ 39-41. Ford ordered a commercial trademark search. Chollet ¶ 46.

That Ford indicia always appears with BlueCruise strongly corroborates the absence of bad faith. *See One Indus.*, 578 F.3d at 1164 (corporate name on "boxes and product literature" supports "lack of evidence of intent to deceive"); *EA Eng'g*, 703 F. Supp. at 857 (corporate name use "evinces a good faith effort"); *Skechers*, 2007 WL 4181677, at *8 ("[T]he clear labeling of the accused shoes with Skechers' brand negates any inference of intent to trade on Vans' mark.").

### 7.   Ford's and GM's Goods Are Similar, but Not Interchangeable, and Expansion of Product Lines Is Not a Factor

The Ford BlueCruise name *only* is being used, and only will be used, for adaptive cruise, hands-free technology requiring some level of driver engagement. Longarzo ¶ 45. From the very first contact between the parties, Ford told Plaintiffs, which they fail to mention, that Ford does not plan to use the BlueCruise name for fully autonomous vehicles or software. *Id.*; Chollet ¶ 40.

The adaptive cruise products of GM and Ford contain similar functionality (but are not in any sense interchangeable). They each can be acquired only at differently branded dealerships (and websites), on clearly branded makes/models (themselves well-known); the operating systems for each are themselves branded, unique to each manufacturer, and visually different. *See* Joachimsthaler ¶¶ 94-98, 178(b); Longarzo ¶¶ 21-36, 48, 74-75.

### D.   Reverse Confusion is Highly Unlikely if Not Impossible

Reverse confusion "occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user." McCarthy § 23:10. To prevail on a reverse confusion case, the plaintiff must establish that consumers who encounter plaintiff's product believe it is associated with defendant. *See Quia Corp. v. Mattel, Inc*., No. C 10-1902 JFHRL, 2010 WL 2486364, at *12 (N.D. Cal. June 15, 2010).

In *Dreamwerks*, the Ninth Circuit identified three factors as central in that reverse confusion case: (1) the arbitrariness of the mark; (2) similarity of sight, sound, and meaning; and

(3) relatedness of the goods. 142 F.3d at 1130. While those factors were pivotal in that case, other factors may be considered. *See Matrix*, 290 F. Supp. 2d at 1090. For example, courts have declined to find reverse confusion based on the "degree of care" that purchasing consumers "are likely to exercise." *Playmakers*, 376 F.3d at 897.

Arbitrariness. As a threshold matter, reverse confusion is exceedingly unlikely, and even impossible, because "Cruise" is generic or descriptive, not arbitrary. *See* Finnegan ¶¶ 13, 49; *see also Dreamwerks*, 142 F.3d at 1132 (keying decision to mark being "fanciful"). "Cruise" is conceptually weak, which means confusion is unlikely. *See Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 992 (C.D. Cal. 2002).

"In reverse confusion cases, courts evaluate the conceptual strength of the senior user's mark, and compare it to the commercial strength of the junior user's mark." *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1224 (C.D. Cal.), *aff'd*, 114 F. App'x 921 (9th Cir. 2004). BlueCruise is not commercially strong now, and Ford's advertising focuses principally on Ford (*e.g.*, Built Ford Tough), secondarily on vehicles (*e.g.*, F-150, Mustang, etc.), and less so discrete features (*e.g.*, BlueCruise); features typically are not dominant in ads. Longarzo ¶¶ 47-48.

Similarity of Marks. As with forward confusion, "[i]n judging similarity, trademarks should be considered as they are encountered in the marketplace, taking into account the normal circumstances surrounding purchase of the type of goods they represent." *Glow*, 252 F. Supp. 2d at 994 (no reverse confusion between "Glow by J.Lo" and "Glow"). *In context*, the marks here differ in sight, sound and meaning. Ford's BlueCruise (one word) appears with other Ford indicia, and Super Cruise appears with Cadillac and/or other GM indicia. *See Moose Creek*, 331 F. Supp. 2d at 1227 ("[T]he court must compare both marks *in their entirety*."); *see also Matrix*, 290 F. Supp. 2d at 1093 (proper comparison is not Matrix alone, but Toyota Matrix). CLLC's "cruise" appears to the public in lower case and with orange. Longarzo These differences create a different "commercial identity" and obviate any confusion. *Cohn*, 281 F.3d at 842; *accord Moose Creek*, 331 F. Supp. 2d at 1227.

Plaintiffs' argument that the FORD® house mark could exacerbate reverse confusion is misplaced. It is (wrongly) based on the possibility that adding a house mark to a highly-distinctive

mark may not help dispel confusion. But, in the case of a widely-used, weak term, a house mark will distinguish and further indicate source. As noted in *Moose Creek*, 331 F. Supp. 2d at 1227:

> Given the large number of manufacturers who affix either a picture of a moose or the word "moose" to their clothing (of whose products Plaintiffs' customers are presumably aware), it is not likely that Plaintiffs' customers would see a garment sold in an Abercrombie retail outlet, on which a picture of a moose and an Abercrombie house mark were affixed, and conclude that Abercrombie had formed a commercial relationship (such as a licensing relationship) with Plaintiffs, as opposed to with some other clothing manufacturer who also affixes a moose to its clothing.

Based on the long-standing and ubiquitous use of "cruise" in connection with driving systems, consumers encountering a Ford vehicle with the BlueCruise feature are unlikely to conclude that Ford somehow has formed a commercial relationship with CLLC or its Chevy Bolt robotaxis.

 <u>Relatedness of Goods</u>. Ford BlueCruise driver assist technology and Cruise robotaxis are not "related" goods or services. *See Matrix*, 290 F. Supp. 2d at 1092 ("Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category."). Plaintiffs contend that "cruise" robotaxis are trailblazing. Nobody seeking out Jetson-like driverless robotaxis will associate that with sitting behind the wheel and engaging adaptive cruise. *See* Joachimsthaler ¶¶ 20, 31, 150; Longarzo ¶¶ 87-90. For CLLC's retail partners (*e.g.*, Wal-Mart), the record is devoid of confusion on their part.

 <u>Sophistication of Purchasers</u>. For reverse confusion, the focus is on senior user's customers. *See Playmakers*, 376 F.3d at 897 (degree of care makes reverse confusion unlikely); *Cohn*, 281 F.3d at 843 ("reasonably attentive pet owners should be particularly attentive …, and thus are likely to perceive the differences"). Cruise's robotaxi customers—Walmart and the Kingdom of Dubai and, maybe later, people Plaintiffs describe as laser-focused on safety—are careful and sophisticated.

 <u>Survey Evidence Confirms that Reverse Confusion is Unlikely</u>. "Plaintiffs have not provided any survey data suggesting that confusion is occurring on a broader scale.…" *Moose Creek*, 331 F. Supp. 2d at 1230. However, Sarah Butler, a survey expert, conducted a survey to test reverse confusion. Her survey included a BlueCruise video,[15] and three other videos using

---

[15] Plaintiffs suggest in passing that Ford BlueCruise might cause reverse confusion with GM Super Cruise. In addition to the factors above, Ford does not have the ability to "overpower" or "swamp" GM. In fact, because Cruise is a GM subsidiary with billions in investment, it strains credulity to think that Ford's resources are disproportionate. *See* Chollet ¶ 12; Longarzo ¶¶ 68-71, 86.

"cruise"—one from CLLC and two from other automakers. The results were definitive—net confusion was *zero*; confusion not only is unlikely but nonexistent. Butler ¶¶ 4-5.

## II. Ford Would Suffer Massive Harm, including Irreparable Harm, if Enjoined, So that The Balance of Hardships Factor Tilts Strongly in Ford's Favor

Ford spent substantial time and effort developing the BlueCruise name, publicizing it to the press and consumers, and creating communication material. Longarzo ¶¶ 56-60. The name announcement coincided with the product launch, and the model year, making it the ideal time to garner attention. *Id.* ¶ 61. Requiring Ford to stop use, and move forward with an unbranded product until a new name is developed, would cause "significant hardship." *JL Beverage Co. v. Beam, Inc.*, 899 F. Supp. 2d 991 (D. Nev. 2012) ("[H]ardships Plaintiff may suffer … are far inferior to those of Defendant."). Ford's substantial monetary exposure and irreparable harm include:

- Losing the "significant financial investment" in getting to this stage. *Playmakers*, 376 F.3d at 898 (denying preliminary injunction); *see* Longarzo ¶¶ 56, 65-66;

- Ceasing use of an announced name now familiar to dealers and consumers because of Ford's "one chance to launch" its new product, and the attendant loss of momentum, goodwill, and trust. *Kroger Co. v. Lidl US, LLC*, No. 3:17-cv-480-JAG, 2017 WL 3262253, at *6 (E.D. Va. July 31, 2017); *see* Longarzo ¶¶ 61, 66-67;

- Having no brand for the product during the delay until a new name is developed (and completes the necessary review). *See Russell Rd. Food & Beverage, LLC v. Spencer*, No. 2:12-CV-01514–LRH-GWF, 2013 WL 321666, at *5 (D. Nev. Jan. 28, 2013) ("balance of hardships tips in favor of" defendant based on "significant amounts in rebranding" and period where it may have "no presence"); *see also* Longarzo ¶ 62;

- Incurring the cost and time to re-educate dealers and consumers, and the trade, on a sub-optimal schedule not tied to either the model year or new product excitement. *Rain Corp. v. JYP Ent., Ltd.*, No. 03:07-CV-00081-LRH-RAM, 2007 WL 18137772 (D. Nev. June 21, 2007) (noting disruptive timing); *see* Longarzo ¶ 63;

- Disrupting relationships with consumers, and "creating confusion among its clients and potential clients," including those who already have purchased and expect BlueCruise

technology. *EA Eng'g*, 703 F. Supp. at 859 (noting such confusion and loss of good will justify denial of preliminary injunction); *see* Longarzo ¶ 64;

- Imposing on independent dealers to educate their staff, and to communicate with existing and prospective consumers, about a different name. *See Sato & Co. v. Kodiak Fresh Produce LLC*, 334 F. Supp. 3d 1023 (D. Ariz. 2017) (impacts on innocent third party are basis for denying injunction); Longarzo ¶ 63; and

- Negatively affecting Ford's relationship with the trade and shareholders. *See Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011); Longarzo ¶¶ 56-67.

Each of these substantial harms outweighs Plaintiffs' speculative concerns. *See Glow*, 252 F. Supp. 2d at 1005 (noting lost investment in development, delay required to make change, and impact on launch and sales are irreparable harm tipping "balance of hardships" in favor of denying injunction).

### III.   Plaintiffs Will Not Suffer Irreparable Harm By Ford's Use of BlueCruise

Plaintiffs, and their expert, offer a range of theories about confusion and harm that "may" or "could" occur.[16] But, "[a]fter *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011). "To obtain injunctive relief, Plaintiffs must show themselves to be under threat of suffering 'injury in fact that is concrete and particularized; the threat must be actual and imminent,' not conjectural or hypothetical ...." *Id.* at 1171. To carry that burden, "the moving party must provide more than conclusory or speculative allegations." *Turo Inc. v. City of Los Angeles*, 847 F. App'x 442, 444 (9th Cir. 2021).

In the trademark context,[17] it is not enough to recite "inability to control.... Plaintiff still has the burden of demonstrating how irreparable harm will occur should injunctive relief not be

---

[16] Dr. Wind's report is rife with speculation, *see* Wind ¶ 63 ("consumers could think"), ¶ 64 ("may assume"), ¶ 74 ("use of 'BlueCruise' could"), ¶ 75 ("the risk is"), ¶ 80 ("could lead consumers"), ¶ 93 ("could be associated"), ¶ 102 ("may be confused"), and empirically wrong. *See* Jay ¶¶ 7-10; Butler ¶ 7. Not surprisingly, in *Gap, Inc. v. G.A.P. Adventures*, No. 07 Civ. 9614 (AKH), 2011 WL 2946384, *11 (S.D.N.Y. June 24, 2011), the Court did "not give significant weight to Dr. Wind's marketing analysis," concluding that "His analysis does not address the perception of ordinary consumers ...." The same is true here. *See* Joachimsthaler ¶¶ 152, 178(f).

[17] The "rebuttable presumption of irreparable harm" exists only upon "a finding of likelihood of success on the merits," and not otherwise. 15 U.S.C. § 1116(a). Even then, it shifts the burden of production, but not "the burden of persuasion," Fed. R. Evid. 301, which remains on Plaintiffs.

granted." *EA Eng'g*, 703 F. Supp. at 858; *accord Herb Reed Enters. v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("cursory and conclusory" allegations of loss of control or damage to goodwill are insufficient); *Freelancer*, 2020 WL 6271030, at *8 ("While loss of goodwill and loss of prospective customers may support a finding of the possibility of irreparable harm, plaintiffs have presented no evidence of actual losses.").

Plaintiffs' alleged harms are unlikely. *See* Joachimsthaler ¶ 156-67, 178(e). They exist, if at all, *only* as the result of likely confusion. "[B]eyond [their] arguments regarding likelihood of consumer confusion, [Plaintiffs do] not demonstrate why preliminary injunctive relief is necessary…." *JL Beverage*, 899 F. Supp. 2d at 991. For example, Plaintiffs' contention that an injunction should be granted to protect rights that they might develop is insufficient as a matter of law. "Trademark rights are not established by goals and dreams." *Matrix*, 290 F. Supp. 2d at 1089.

## IV.     Plaintiffs' Desired Monopoly of "Cruise" is Contrary to Public Policy

Plaintiffs' request for a monopoly over a generic/descriptive term is contrary to the public interest. As the Ninth Circuit declared, "there is also a broad societal interest in preserving common, useful words for the public domain. We do not want to prevent the commercial use of descriptive words to name products, as straightforward names are often the most useful identifiers." *Entrepreneur Media*, 279 F.3d at 1148. The Supreme Court similarly noted "the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first." *KP Permanent Make-Up, Inc. v. Lasting Impression, I, Inc.*, 543 U.S. 111, 122 (2004); *see Classic Foods*, 468 F. Supp. 2d at 1188 ("[G]ranting one company exclusive rights to use a generic term would actually deny vital product information to consumers, because a competing company would be deprived of the ability to name its product what it is."). Here, "the public interest lies in robust competition, and the risk posed to [Plaintiffs by Ford's] mark does not outweigh that interest." *Kroger*, 2017 WL 3262253, at *6.

## CONCLUSION

Ford respectfully requests the Court to deny Plaintiffs' motion.

1

2

DATED: August 13, 2021                Respectfully submitted,

3                                                  KILPATRICK TOWNSEND & STOCKTON LLP

4                                                  By: /s/William H. Brewster
                                                       GREGORY S. GILCHRIST
5                                                      GIA L. CINCONE
                                                       WILLIAM H. BREWSTER
6                                                      R. CHARLES HENN JR.
                                                       NICHOLE DAVIS CHOLLET

7                                                  Attorneys for Defendant
8                                                  FORD MOTOR COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28